# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### January 3, 2013 Session

## VELDA J. SHORE v. MAPLE LANE FARMS, LLC ET AL.

**Appeal by Permission from the Court of Appeals, Eastern Section**
**Chancery Court for Blount County**
**No. 08021     Telford E. Forgety, Jr., Chancellor**

---

**No. E2011-00158-SC-R11-CV - Filed August 19, 2013**

---

This appeal involves a dispute over the noise from amplified music concerts being conducted on farm land in rural Blount County. After the business owners who hosted the concerts defied the county zoning authority's order limiting the concerts to one per year, a neighboring property owner filed suit in the Chancery Court for Blount County seeking to abate the concerts as a common-law nuisance and to enforce the decision of the county board of zoning appeals. The trial court granted the defendants' motion for an involuntary dismissal at the close of the plaintiff's proof, finding that the Tennessee Right to Farm Act, Tenn. Code Ann. §§ 43-26-101 to -104 (2007), precluded nuisance liability and that the concerts were exempted from the local land use regulations because they qualified as "agriculture." The Court of Appeals affirmed. *Shore v. Maple Lane Farms, LLC*, No. E2011-00158-COA-R3-CV, 2012 WL 1245606 (Tenn. Ct. App. Apr. 11, 2012). We granted the plaintiff homeowner permission to appeal. We hold that the trial court erred by granting the motion to dismiss because the plaintiff homeowner presented a prima facie case of common-law nuisance and because the concerts are not "agriculture" for the purpose of the zoning laws.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which GARY R. WADE, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined.

Michael H. Meares, Maryville, Tennessee, for the appellant, Velda J. Shore.

John T. Johnson, Jr., Knoxville, Tennessee, for the appellees, Maple Lane Farms, LLC, Robert A. Schmidt d/b/a Maple Lane Farms, and Al Schmidt d/b/a Maple Lane Farms.

Julie P. Bowling and Edward K. Lancaster, Columbia, Tennessee, for the amicus curiae, Tennessee Farm Bureau Federation, Tennessee Agritourism Association, Tennessee Fruit and

Vegetable Association, Tennessee Soybean Association, Tennessee Farm Winegrowers Alliance, and Tennessee Cattlemen's Association.

**OPINION**

**I.**

Beginning in the mid-1980s, Robert Schmidt and his family acquired approximately 225 acres of property on Maple Lane in the Greenback area of Blount County and began operating Maple Lane Farms. The farm raised cattle, corn, vegetables, strawberries, and pumpkins.

Over the years, however, Mr. Schmidt began to offer public attractions on the farm to increase revenue. Between 2006 and 2008, these attractions accounted for approximately 75% of the total revenue of Maple Lane Farms. Each spring, Maple Lane Farms hosted a Strawberry Jam Festival that offered activities, including strawberry picking, face painting, rock climbing, inflatables, and other games. Each fall, the farm presented a multi-week festival with attractions that included a corn maze, a pick-your-own pumpkin patch, hayrides, antique shows, and pageants. At some point, Mr. Schmidt began hosting amplified music concerts during the spring and fall festivals.[1]

In May 2003, Velda J. Shore, a retiree from Middle Tennessee, moved to the Mountain Meadows subdivision adjacent to Maple Lane Farms. Ms. Shore, who was in her mid-seventies, believed that Nashville had become too crowded and wanted to find a home "with a little piece of land where I could work it and get out and grow something." Her one-half acre tract is on a bluff overlooking Maple Lane Farms, approximately 150 feet from the Maple Lane Farms boundary line. The back and side of her house are mostly windows that enable Ms. Shore to enjoy views of the mountains and the lake.

Before she purchased her property, Ms. Shore was informed that there was no commercial activity in the area. After she moved into her new home, Ms. Shore discovered that Maple Lane Farms operated a corn maze in the fall that was open to the public and that hayrides and a pick-your-own pumpkin patch were also available. She did not find these activities bothersome and, in fact, "enjoyed seeing the children and the tractor pulling the wagon around to get the pumpkins."

According to Ms. Shore, the spring and fall activities at Maple Lane Farms expanded significantly between 2006 and 2008. Mr. Schmidt began offering all- terrain vehicle

---

[1]The record does not pinpoint when Mr. Schmidt began presenting music festivals at Maple Lane Farms.

demonstrations and helicopter rides that provided the passengers with an opportunity to see the corn maze from the air. The helicopters flew directly over Ms. Shore's house. In addition, Mr. Schmidt began presenting fireworks displays at night and hosting a number of open-air concerts featuring amplified music. These concerts occurred during the day and at night.[2]

Ms. Shore became increasingly concerned about the noise from the concerts, as well as the congestion on the roads and the trash left by the persons who attended the events at Maple Lane Farms. She testified that she could hear the "boom, boom, boom, boom" of the music throughout her home. Ms. Shore also testified that she left her home during the daytime concerts to escape the noise. However, she could not escape the noise during the nighttime concerts because she could not drive at night. Ms. Shore testified that, because of the noise, she was forced to keep her windows and doors closed and remain inside during "the best time . . . of the year to have your doors and windows open or to sit out on the deck or on the front porch."

On October 8, 2007, Ms. Shore sent a letter to the Blount County Commission regarding the activities at Maple Lane Farms. At the time, Mr. Schmidt's fall festival was in full swing. Ms. Shore compared her circumstances to "living close to another 'Dollywood,'" and described the loud music, the noise, and the helicopter flights. She wrote that she did not desire Maple Lane Farms to "close down their festivities." Rather, she asked for "reasonable accommodation, where each may enjoy the land where they have put their life savings."

As a result of Ms. Shore's letter, Roger Fields, the Blount County Building Commissioner, wrote Mr. Schmidt on November 1, 2007. Mr. Fields's letter informed Mr. Schmidt that his corn maze fell "under exemptions for agricultural uses." However, the letter also directed Mr. Schmidt to cease offering helicopter rides and concerts "within the next thirty (30) days" and warned that "[f]ailure to comply will result in further legal action." Mr. Fields also informed Mr. Schmidt of his right to appeal the decision to the Blount County Board of Zoning Appeals ("Board").

On November 9, 2007, Mr. Schmidt appealed Mr. Fields's decision to the Board. However, before Mr. Schmidt's appeal could be heard, Mr. Fields apparently reconsidered his decision and informed Mr. Schmidt that he would be allowed to hold two events each year, as well as other "agricultural entertainment." Ms. Shore was upset by what she considered a unilateral decision by Mr. Fields. On December 11, 2007, she appealed Mr.

_____

[2]Promotional materials indicated that on some days there was only one musical performance, while on other days there were two. The materials indicate the performances were scheduled to last for two to two-and-a-half hours.

-3-

Fields's revised decision to the Board.[3] At the Board's meeting on January 3, 2008, three of the five members decided that Mr. Schmidt's concerts were "not being supportive of agricultural use" and, therefore, that Mr. Schmidt would be permitted to hold only one concert per year at Maple Lane Farms.

Mr. Fields sent Mr. Schmidt formal notification of the Board's decision on January 8, 2008. Five days later, a local newspaper published a letter from Mr. Schmidt's father regarding the "circus" at the Board's meeting of January 3, 2008. His letter stated, in part, that "[w]hat we had at the recent Zoning Board meeting was a coalition of greed, jealousy and mental instability. The Zoning Board should have charged an amusement tax for this 'chicken-picking' contest. Some of the comments were laughable at best." The letter ended with, "If my comments offend anyone I could care less."

In early February 2008 a "for sale" sign mysteriously appeared in Ms. Shore's yard. In addition, unknown persons began banging on Ms. Shore's windows and doors and ringing her doorbell in the middle of the night. Other hand-made signs with slogans such as "Say a prayer and more for V.J. Shore" or "Rock Group Coming to a court house near you . . . VJ and the Trouble Makers" began appearing in Ms. Shore's neighborhood. These actions upset Ms. Shore. On one occasion, she observed Mr. Schmidt laughing at her while she was attempting to remove one of the signs.

Mr. Schmidt did not seek judicial review of the Board's decision of January 3, 2008. Instead, in a letter dated February 7, 2008, Mr. Schmidt's lawyer informed the Board's chairman that his client "believe[s] that he is not bound by any decision that the [Board] has made due to his agricultural status."

On the same day that Mr. Schmidt's lawyer informed the Board that his client intended to disregard its decision, Ms. Shore filed suit against Mr. Schmidt and others[4] in the Chancery Court for Blount County. In her complaint, Ms. Shore requested the trial court to declare that the "commercial and tourist activities" Mr. Schmidt was conducting at Maple

---

[3]In a letter dated December 13, 2007, Mr. Fields explained to Ms. Shore that he had decided "that the music festivals are not in violation as long as they are incidental temporary uses on the property." He also informed Ms. Shore that Mr. Schmidt had "agreed not to have the helicopter rides and to keep the concerts as temporary incidental uses" on the property. Thereafter, Mr. Schmidt ceased offering helicopter rides.

[4]The defendants named in Ms. Shore's lawsuit were Robert A. Schmidt, Al Schmidt, and Maple Lane Farms, LLC. The record reflects that Mr. Schmidt had permitted the limited liability company to be administratively dissolved and that Al Schmidt, Mr. Schmidt's father, played only a minor role in the operation and management of Maple Lane Farms. Accordingly, for ease of reference, we will refer to the defendants in this case as "Mr. Schmidt."

Lane Farms were not agricultural uses of the property and, therefore, were subject to the county's zoning regulations. Ms. Shore also requested the trial court to prevent Mr. Schmidt from conducting commercial and tourist activities at Maple Lane Farms in violation of the zoning restrictions. She specifically requested that Mr. Schmidt be enjoined from holding the Strawberry Jam Festival scheduled for May 19 and 20, 2008. Ms. Shore also alleged that the activities occurring at Maple Lane Farms constituted a nuisance and requested the trial court to abate the nuisance. Ms. Shore later amended her complaint to allege that the concerts being held at Maple Lane Farms were "an on-going violation of the [Board's decision], and therefore a nuisance per se."

The trial court denied Ms. Shore's request for a temporary injunction to prevent Mr. Schmidt from presenting the 2008 Strawberry Jam Festival. As reflected in his lawyer's letter dated February 7, 2008, Mr. Schmidt disregarded the Board's order limiting him to one concert per year. He held at least one concert during the Strawberry Jam Festival and, later in 2008, advertised that he would be holding more concerts during the fall festival. On September 12, 2008, Mr. Fields sent Mr. Schmidt a letter reminding him of the Board's decision at its meeting on January 3, 2008. Mr. Fields noted that Mr. Schmidt had already held one concert and that "any additional concerts will be a violation." Mr. Schmidt ignored Mr. Fields's letter. According to Ms. Shore, Mr. Schmidt held at least four concerts at Maple Lane Farms in 2008.[5]

The trial court heard Ms. Shore's complaint without a jury on July 6, 2010. Ms. Shore and three other neighbors of Maple Lane Farms testified about the disturbance and disruption caused by the concerts. Jim Hartman described the traffic issues, the noise problems from "9:00 p.m. up into the wee hours of the morning," the lights from the Maple Lane Farms parking lot, and the trash thrown in his yard. He explained that for two months of the year, it was "impossible to get [his two children] in the bed at 9:00 p.m." because "there's still activities ongoing at the farm." He also testified that "we tell people that we live across the street from a Wal-Mart parking lot two months out of the year."

Eddie Johnson, Mr. Schmidt's father's next-door neighbor, testified that the noise from Maple Lane Farms was so loud that "[y]ou can't hear the TV" and that he had replaced his windows with insulated windows to dampen the noise. He also stated that the noise made it difficult to sleep and that "[a] lot of times I leave home." Mr. Johnson described the festivals at Maple Lane Farms as "noise all the time, from 10:00 till 2:00 and sometimes after 2:00." Lark Hayden testified that the activities at Maple Lane Farms had increased over the years. She also explained that "the music was just very, very, very loud . . . like I could almost feel the vibrations in my chest, you know, the whole house, and you couldn't get away

_____

[5]Weather and economic concerns apparently limited the number of concerts held at Maple Lane Farms in 2009.

-5-

from it." Even though Ms. Hayden had previously signed a petition in support of Maple Lane Farms, she stated that she was "really bothered" by the "loud concerts."

After Ms. Shore rested her case, Mr. Schmidt moved for an involuntary dismissal in accordance with Tenn. R. Civ. P. 41.02(2). He insisted that Ms. Shore had failed to overcome the presumption in the Tennessee Right to Farm Act that farming operations are not nuisances.[6] Rather than directly addressing the basis of Mr. Schmidt's motion, the trial court entered an order on July 26, 2010, dismissing Ms. Shore's complaint because she had failed to name Mr. Schmidt's mother as a defendant. Even though this issue had never been raised by Mr. Schmidt, the trial court decided that Mr. Schmidt's mother was an indispensible party because she was the owner of record of several of the parcels of property that comprised Maple Lane Farms.

Ms. Shore filed a timely motion for a new trial. In response, Mr. Schmidt requested the trial court to decide his motion for involuntary dismissal based on the evidence Ms. Shore had presented. He continued to insist that Ms. Shore had failed to rebut the presumption in Tenn. Code Ann. § 43-26-103 that farm operations are not nuisances and that she had failed to prove that his concerts were nuisances.

At a hearing on December 7, 2010, the trial court observed that "I should have gone ahead and ruled on the merits [of] the motion at the close of the plaintiff's proof." On January 6, 2011, the trial court filed an order and separate findings of fact and conclusions of law. The trial court again dismissed Ms. Shore's complaint. When read together, the order and findings of fact and conclusions of law reflect that the trial court dismissed Ms. Shore's complaint for several reasons. First, the trial court denied Ms. Shore's motion for a new trial "as a matter of docket control/caseflow management."[7] Second, the trial court found that Maple Lane Farms was an "active farm operation" for the purpose of the Tennessee Right to Farm Act and that Ms. Shore had failed to rebut the presumption in Tenn. Code Ann. § 43-26-103 that a farming operation is not a nuisance. Third, the trial court concluded that Mr. Schmidt's violation of the Board's order did not provide Ms. Shore with grounds for relief because the Blount County Zoning Resolution does not apply to Maple Lane Farms.

---

[6]*See* Tenn. Code Ann. § 43-26-103(a) (2007).

[7]The trial court explained this case had been set for trial "multiple" times and that it had "reluctantly" granted continuances. The trial court also stated that "[t]o allow a new trial in this case would have the effect of placing it back on the Court's docket simply because it was not ready to be tried to conclusion on the date the trial was set, and conducted." The record contains no indication that the parties were not ready to try this case on July 6, 2010.

Ms. Shore appealed the trial court's decision. The Court of Appeals handed down its opinion on April 11, 2012, affirming the trial court's dismissal of Ms. Shore's complaint. *Shore v. Maple Lane Farms, LLC*, No. E2011-00158-COA-R3-CV, 2012 WL 1245606, at *1 (Tenn. Ct. App. Apr. 11, 2012). The court concluded that Maple Lane Farms was engaging in sufficient agricultural activities to be exempted from Blount County's zoning regulations. *Shore v. Maple Lane Farms, LLC*, 2012 WL 1245606, at *7. The court also concluded that the "activities at the farm meet the definition of agritourism found in Tennessee Code Annotated section 43-39-101" and that the "legislature clearly considers agritourism to be the equivalent of agriculture, i.e., '[r]ecreational and educational activities on land used for the commercial production of farm products.'" *Shore v. Maple Lane Farms, LLC*, 2012 WL 1245606, at *12 (alteration in original) (quoting Tenn. Code Ann. §§ 1-3-105(2)(A)(iii), 43-1-113(b)(1)(C)). Accordingly, the court decided that Ms. Shore had failed to rebut the presumption in Tenn. Code Ann. § 43-26-103 that farming is not a nuisance. *Shore v. Maple Lane Farms, LLC*, 2012 WL 1245606, at *12-13. We granted Ms. Shore permission to appeal.

## II.

This appeal comes to us from the trial court's order granting Mr. Schmidt's motion for involuntary dismissal at the close of Ms. Shore's proof. A complaint may be dismissed pursuant to Tenn. R. Civ. P. 41.02(2) if, based on the law and the evidence, the plaintiff failed to demonstrate a right to the relief sought. *City of Columbia v. C.F.W. Constr. Co.*, 557 S.W.2d 734, 740 (Tenn. 1977). A trial court entertaining a motion for involuntary dismissal under Tenn. R. Civ. P. 41.02(2) must impartially weigh and evaluate the evidence just as it would after all the parties had presented their evidence. *Building Materials Corp. v. Britt*, 211 S.W.3d 706, 711 (Tenn. 2007) (citing *City of Columbia v. C.F.W. Constr. Co.*, 557 S.W.2d at 740). The court may dismiss the plaintiff's claim if the plaintiff has failed to make out a prima facie case. *Building Materials Corp. v. Britt*, 211 S.W.3d at 711; *Smith v. Inman Realty Co.*, 846 S.W.2d 819, 822 (Tenn. Ct. App. 1992). If the trial court grants a motion for involuntary dismissal, Tenn. R. Civ. P. 41.02(2) requires the court to "find the facts specially and . . . state separately its conclusions of law."

Appellate courts review a trial court's decision to grant an involuntary dismissal in accordance with Tenn. R. App. P. 13(d). *Building Materials Corp. v. Britt*, 211 S.W.3d at 711; *Irvin v. City of Clarksville*, 767 S.W.2d 649, 653 (Tenn. Ct. App. 1988). Accordingly, we must review the record de novo, presuming that the trial court's factual findings are correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002). If the trial court has not made a specific finding on a particular matter, we review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness.

*Hickman v. Continental Baking Co.*, 143 S.W.3d 72, 75 (Tenn. 2004); *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

The presumption of correctness afforded by Tenn. R. App. P. 13(d) applies only to findings of fact, not to conclusions of law. We review a trial court's resolution of legal issues without employing a presumption of correctness, and we reach our own independent conclusions. *In re Estate of Brown*, ___ S.W.3d ___, ___, No. E2011-00179-SC-R11-CV, 2013 WL 1173935, at *3 (Tenn. 2013); *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001); *Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 367 (Tenn. 1998). A trial court's interpretation of statutes, procedural rules, and local ordinances involves questions of law which appellate courts review de novo without a presumption of correctness. *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 895 (Tenn. 2011); *Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 802 (Tenn. 2000).

When reviewing a trial court's grant of a Tenn. R. Civ. P. 41.02(2) motion to dismiss, the reviewing court must affirm the trial court's decision unless the evidence preponderates against the trial court's factual determinations or the trial court's decision is based on an error of law that affects the outcome of the case. *Boyer v. Heimermann*, 238 S.W.3d 249, 254-55 (Tenn. Ct. App. 2007) (citing *Burton v. Warren Farmers Coop.*, 129 S.W.3d at 521); *see also Via v. Oehlert*, 347 S.W.3d 224, 228-29 (Tenn. Ct. App. 2010).

This appeal presents two intertwined issues.[8] The first issue is whether Ms. Shore presented a prima facie case of nuisance based on activities at Maple Lane Farms that are not otherwise exempted from nuisance claims by the Tennessee Right to Farm Act. Interpreting the scope of the Act involves an issue of law. The second issue is whether the amplified music concerts conducted at Maple Lane Farms are "agriculture" and, therefore, are exempt from the restrictions of the Blount County Zoning Resolution. The interpretation of the state statutes that empower county zoning regulations – and the county regulations themselves – also involves an issue of law. Thus, we will address both issues de novo without affording a presumption of correctness to the trial court's interpretation and application of the Tennessee Right to Farm Act, the state statutes authorizing county zoning regulations, and Blount County's Zoning Resolution.

---

[8]The trial court's January 6, 2011 order and findings of fact and conclusions of law do not provide us with clear guidance regarding the extent to which the trial court based its decision on its earlier concern that Ms. Shore had failed to join a necessary party or on its belief that its ability to control its docket required the denial of Ms. Shore's motion for a new trial. These issues were not raised by the parties in the Court of Appeals or before this Court. Because the parties have not addressed these issues, we deem them waived. *See Hodge v. Craig*, 382 S.W.3d 325, 334-35 (Tenn. 2012).

## III.

We turn first to Ms. Shore's common-law nuisance claim. Because of the procedural posture of this case, the resolution of this issue hinges more on the meaning and application of the Tennessee Right to Farm Act than on the strength of Ms. Shore's evidence.

### A.

The right to the free use and enjoyment of property has long been recognized as an important facet of ownership. However, this right is not an unrestricted license to use property without regard for the impact of the use on others. The legal maxim – *sic utere tuo ut alienum non laedas*[9] – directs landowners not to use their property in a way that injures the lawful rights of others. Thus, since the earliest days, Tennessee's courts have recognized that "[e]very individual, indeed, has a right to make the most profitable use of that which is his own, so that he does not injure others in the enjoyment of what is theirs." *Neal v. Henry*, 19 Tenn. (Meigs) 17, 21 (1838). This longstanding principle is the cornerstone of a common-law nuisance claim. 1 Kenneth H. Young, *Anderson's American Law of Zoning* § 3.03 (4th ed. 1995).

A common-law nuisance is a tort characterized by interference with the use or enjoyment of the property of another. W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 87, at 619 (5th ed. 1984) [hereinafter "*Prosser & Keeton*"]. A nuisance is anything that annoys or disturbs the free use of one's property or that renders the property's ordinary use or physical occupation uncomfortable. It extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of the property. *Pate v. City of Martin*, 614 S.W.2d 46, 47 (Tenn. 1981); *Caldwell v. Knox Concrete Prods., Inc.*, 54 Tenn. App. 393, 402, 391 S.W.2d 5, 9 (1964).

As long as an interference with the use or enjoyment of property is substantial and unreasonable enough to be offensive or inconvenient, virtually any disturbance of the use or enjoyment of the property may amount to a nuisance. *Lane v. W.J. Curry & Sons*, 92 S.W.3d 355, 365 (Tenn. 2002) (quoting *Prosser & Keeton* § 87, at 620).[10] However, an activity or use of property that constitutes a nuisance in one context may not constitute a nuisance in

---

[9]"[S]o use your own as not to injure another's property." *Black's Law Dictionary* 1872 (9th ed. 2009).

[10]In his revision to *Gibson's Suits in Chancery*, Chancellor Inman explains that "[a] person may be driven from his home by bad smells, noxious vapors, unbearable noises, shocking spectacles, and other intolerable nuisances upon his neighbor's land, quite as effectually as though driven away by physical force." William H. Inman, *Gibson's Suits in Chancery* § 2.17, at 2-19 (8th ed. 2004).

another context. Whether an activity or use of property amounts to an unreasonable invasion of another's legally protected interests "depends on the circumstances of each case, such as the character of the surroundings, the nature, utility, and social value of the use, and the nature and extent of the harm involved." *Lane v. W.J. Curry & Sons*, 92 S.W.3d at 364-65 (citing *Pate v. City of Martin*, 614 S.W.2d at 47).

Whether a particular activity or use of property is a nuisance is measured by its effect on a "normal person," not by its effect on the "hypersensitive." *Jenkins v. CSX Transp., Inc.*, 906 S.W.2d 460, 462 (Tenn. Ct. App. 1995). Rather, the standard for determining whether a particular activity or use of property is a nuisance is "its effect upon persons of ordinary health and sensibilities, and ordinary modes of living, and not upon those who, on the one hand, are morbid or fastidious or peculiarly susceptible to the thing complained of, or, on the other hand, are unusually insensible thereto." *Jenkins v. CSX Transp., Inc.*, 906 S.W.2d at 462 (quoting *Johnson v. Cowden*, 5 Tenn. Civ. App. 1, 7 (1914)). Thus, as Professors Prosser and Keeton have noted, "[i]f normal persons living in the area or community would regard the invasion in question as definitely offensive, seriously annoying, or intolerable, then the invasion is both significant and unreasonable." *Prosser & Keeton* § 88, at 627-28.

With respect to noise in particular, no person is entitled to absolute quiet in the enjoyment of his or her property. Rather, a person may insist only upon the degree of quietness consistent with the locality in which he or she dwells or conducts business. *Caldwell v. Knox Concrete Prods., Inc.*, 54 Tenn. App. at 402, 391 S.W.2d at 9-10. Nevertheless, excessive noise may constitute a nuisance when it imposes discomfort beyond the reasonable limit dictated by surrounding conditions. *Caldwell v. Knox Concrete Prods., Inc.*, 54 Tenn. App. at 403, 391 S.W.2d at 10. While lawful and useful businesses should not be adversely affected based on "trifling and imaginary" annoyances that might "offend the taste or disturb the nerves of a fastidious or over refined person," the law does not countenance anyone being driven from their home or being compelled to live in discomfort. *Caldwell v. Knox Concrete Prods., Inc.*, 54 Tenn. App. at 403, 391 S.W.2d at 10 (quoting 39 Am. Jur. *Nuisances* § 45, 327-28 (1942)).

Whether a particular level of noise constitutes a nuisance depends on a variety of circumstances. *Caldwell v. Knox Concrete Prods., Inc.*, 54 Tenn. App. at 402, 391 S.W.2d at 9. Among the relevant circumstances are the locality, the character of the neighborhood, the nature of the use causing the noise, the extent and frequency of the injury, the time of day when the noise occurs, and the effects on the enjoyment of life, health, and property of those affected by the noise. *Pate v. City of Martin*, 614 S.W.2d at 47 (quoting *Caldwell v. Knox Concrete Prods., Inc.*, 54 Tenn. App. at 402, 391 S.W.2d at 9).

The appropriate remedies for nuisance include damages, injunctive relief, and abatement by self-help. *Prosser & Keeton* § 89, at 637. Damages and injunctive relief are

not mutually exclusive. *See Pate v. City of Martin*, 614 S.W.2d at 48 ("Seldom, if ever, will an award of damages, standing alone, be an adequate remedy where the nuisance gives every promise of continuing and is one that can be corrected . . . .").

**B.**

Right-to-farm laws are a nationwide phenomenon. *See* 4 Patricia E. Salkin, *American Law of Zoning* § 33:5 (5th ed. 2011) [hereinafter "Salkin"]. They took hold in the late 1970s in response to accelerating conversion of farmland to non-agricultural uses. Margaret Rosso Grossman & Thomas G. Fischer, *Protecting the Right to Farm: Statutory Limits on Nuisance Actions Against the Farmer*, 1983 Wis. L. Rev. 95, 99, 117-18 [hereinafter "Grossman & Fischer"]; Jacqueline P. Hand, *Right-to-Farm Laws: Breaking New Ground in the Preservation of Farmland*, 45 U. Pitt. L. Rev. 289, 289-91 (1984) [hereinafter "Hand"]. These laws reflected that reversing the loss of productive farmland was high on the national policy agenda. Patricia Norris et al., *When Urban Agriculture Meets Michigan's Right to Farm Act: The Pig's in the Parlor*, 2011 Mich. St. L. Rev. 365, 367 [hereinafter "Norris et al."].

The concern over the loss of productive farmland triggered an array of different legislative solutions. Grossman & Fischer, 1983 Wis. L. Rev. at 100-01. One of these solutions was to encourage farmers to continue farming by offering them various forms of tax relief. Hand, 45 U. Pitt. L. Rev. at 293. At its core, the tax relief approach functions by assessing land used for farming at less than its fair market value. Hand, 45 U. Pitt. L. Rev. at 293-94. The Tennessee General Assembly provided this sort of tax relief to farmers when it enacted the Agricultural, Forest and Open Space Land Act of 1976.[11]

Another solution addressed the perception that nuisance lawsuits were a contributing factor to the loss of farmland. The spread of non-agricultural uses of property, particularly residential developments, into formerly agricultural areas resulted in increased friction between farmers and their non-farmer neighbors. Norris et al., 2011 Mich. St. L. Rev. at 367. Nuisance complaints often followed, "levied by individuals who built homes in rural areas and then objected to noises, odors, dust, chemical use, and slow-moving machinery" associated with agricultural uses of the land. Norris et al., 2011 Mich. St. L. Rev. at 367.[12]

---

[11] Act of Mar. 18, 1976, ch. 782, 1976 Tenn. Pub. Acts 1056 (codified as amended at Tenn. Code Ann. §§ 67-5-1001 to -1050 (2011)); *see also* Tenn. Code Ann. § 67-6-207 (2011) (exempting from sales tax the sale of certain personal property used for producing agricultural products).

[12] *See also* Recent cases, *Nuisance – Equitable Remedies – Plaintiffs Who "Come to Nuisance" Granted Injunctive Relief but Required to Compensate Defendant for Reasonable Cost of Shutting Down*, 26 Vand. L. Rev. 193 (1973) (analyzing the disposition of nuisance actions brought against farmers by
(continued...)

Right-to-farm laws became the most common legislative solution to this perceived problem. Hand, 45 U. Pitt. L. Rev. at 297-98.

In the beginning, these right-to-farm laws amounted to little more than a codification of the common-law concept of "coming to a nuisance."[13]  Norris et al., 2011 Mich. St. L. Rev. at 373; Neil D. Hamilton, *Right-to-Farm Laws Reconsidered: Ten Reasons Why Legislative Efforts to Resolve Agricultural Nuisances May Be Ineffective*, 3 Drake J. Agric. L. 103, 104 (Spring 1998) [hereinafter "Hamilton"]; Grossman & Fischer, 1983 Wis. L. Rev. at 118.  While they were not patterned after a uniform or model act, one of their central tenets was that "if an agricultural operation was not a nuisance prior to changed conditions (e.g., non-farm residential development) in the surrounding area, then it cannot become a public or private nuisance because of changing conditions."  Norris et al., 2011 Mich. St. L. Rev. at 373; *see also* 4 Salkin § 33:5.  Thus, these laws reflected a legislative policy judgment that the traditional balancing of varying factors – the character of the surroundings, the nature, utility, and social value of the uses or activities, and the nature and extent of the harm involved – intrinsic to determining the existence of a nuisance should ordinarily be tipped toward agriculture in the case of conflicting uses of land.  Grossman & Fischer, 1983 Wis. L. Rev. at 117; Hand, 45 U. Pitt. L. Rev. at 304-05.

---

[12](...continued)
residential developments).

[13]It would be somewhat of an overstatement to characterize the concept of "coming to a nuisance" or "moving to a nuisance" as a defense to a nuisance action.  The fact that the plaintiff in a nuisance action moved into an area affected by an existing nuisance has never been a complete defense to an action seeking to abate a nuisance.  *City of Nashville v. Wills*, 7 Tenn. Civ. App. 97, 108 (1916); Joseph A. Joyce & Howard C. Joyce, *Treatise on the Law Governing Nuisances* § 49, at 86 (1906) [hereinafter "Joyce & Joyce"]; Hand, 45 U. Pitt. L. Rev. at 303-04 & n.80.  Professors Prosser and Keeton explain that "coming to the nuisance" is simply one factor to consider while weighing the equities in an abatement action and that it is irrelevant with regard to a claim for damages.  *Prosser & Keeton* § 88B, at 635.  Of particular relevance to this case, one treatise on nuisances points out that

> [t]he fact that a trade or occupation was established at a place remote from buildings and public roads and has been carried on for a period ordinarily sufficient to confer a right or title by prescription, does not entitle the owner to continue it in the same place, after houses have been built and roads laid out in the neighborhood, where it is a nuisance to the occupants of such houses and travelers upon the roads.

Joyce & Joyce § 54, at 91.

When it enacted the Agricultural, Forest and Open Space Land Act of 1976, the Tennessee General Assembly found that "[m]any prime agricultural and forest lands in Tennessee, valuable for producing food and fiber for a hungry world, are being permanently lost for any agricultural purposes and that these lands constitute important economic, physical, social, and esthetic assets to the surrounding lands and to the people of Tennessee." Tenn. Code Ann. § 67-5-1002(3). Six years later, based on this finding, the General Assembly enacted the Tennessee Right to Farm Act.[14]

The Tennessee Right to Farm Act protects farms and farm operations from nuisance claims by creating a rebuttable presumption that they are not nuisances. Tenn. Code Ann. § 43-26-103 provides:

> (a) It is a rebuttable presumption that a farm or farm operation, except a new type of farming operation as described in subsection (b), is not a public or private nuisance. The presumption created by this subsection (a) may be overcome only if the person claiming a public or private nuisance establishes by preponderance of the evidence that either:
> (1) The farm operation, based on expert testimony, does not conform to generally accepted agricultural practices; or
> (2) The farm or farm operation alleged to cause the nuisance does not comply with any applicable statute or regulation, including without limitation statutes and regulations administered by the department of agriculture or the department of environment and conservation.
> (b) With regard to the initiation of a new type of farming operation, there is a rebuttable presumption that the new type of farm operation is not a public or private nuisance, if the new type of farming operation exists for one (1) year or more on the land that is the subject of an action for nuisance before the action is initiated. The presumption created by this subsection (b) may be overcome only if the person claiming a public or private nuisance establishes by a preponderance of the evidence that either:

---

[14]Act of Mar. 10, 1982, ch. 609, 1982 Tenn. Pub. Acts 92 (codified as amended at Tenn. Code Ann. §§ 43-26-101 to -104 (2007)).

(1)     The new type of farm operation, based on expert testimony, does not conform to generally accepted agricultural practices; or

(2)     The new type of farm operation alleged to cause the nuisance does not comply with any applicable statute or regulation, including without limitation statutes and regulations administered by the department of agriculture or the department of environment and conservation.

(c)     As used in this section, "new type of farming operation" means a farm operation that is materially different in character and nature from previous farming operations and that is initiated subsequent to the date that the person alleging nuisance became the owner or lessee of the land, the use or enjoyment of which is alleged to be affected by the farming operation; "new type of farming operation" does not include the expansion or addition of facilities for a type of farming operation that existed on the land that is the subject of an action for nuisance prior to the date that the person alleging nuisance became the owner or lessee of the land, the use or enjoyment of which is alleged to be affected by the farming operation.

(d)     Nothing in this section shall be construed as limiting the ability of the trier of fact to determine whether a particular farming activity is either a new type of farming operation as defined in this section, or is an expansion of or addition to an existing type of farming operation.

Most significant for this appeal, the Act defines a "farm operation" as

a condition or activity that occurs on a farm in connection with the commercial production of farm products or nursery stock as defined in § 70-8-303, and includes, but is not limited to: marketed produce at roadside stands or farm markets; noise; odors; dust; fumes; operation of machinery and irrigation pumps; ground and aerial seeding and spraying; the application of chemical fertilizers, conditioners, insecticides, pesticides, and herbicides; and the employment and use of labor.

Tenn. Code Ann. § 43-26-102(2). The Act also defines a "farm" as "the land, buildings, and machinery used in the commercial production of farm products and nursery stock as defined in § 70-8-303." Tenn. Code Ann. § 43-26-102(1). In addition, the Act defines "farm products" as

those plants and animals useful to man and includes, but is not limited to, forages and sod crops; grains and feed crops; dairy and dairy products; poultry and poultry products; livestock, including breeding and grazing; fruits; vegetables; flowers; seeds; grasses; trees; fish; apiaries; equine and other similar products; or any other product that incorporates the use of food, feed, fiber or fur.

Tenn. Code Ann. § 43-26-102(3).

**D.**

A threshold question regarding Ms. Shore's nuisance claim – one seemingly overlooked by both the trial court and the Court of Appeals – is whether the Tennessee Right to Farm Act applies to the activity at issue in this case. The lower courts appear to have assumed that all the activities occurring at Maple Lane Farms would be covered by the Act as long as some threshold amount of agricultural activity was occurring somewhere on the farm.[15]  Working from this assumption, the lower courts turned their attention to deciding whether Ms. Shore had presented sufficient evidence – focused on generally accepted agricultural practices – to rebut the presumption in Tenn. Code Ann. § 43-26-103(a) that the amplified music concerts presented at Maple Lane Farms were not nuisances. *See Shore v. Maple Lane Farms, LLC*, 2012 WL 1245606, at *12-13.  The Tennessee Right to Farm Act does not bear out this approach.

The Tennessee Right to Farm Act does not extend nuisance protection to all activities occurring on a farm.  Rather, the Act provides nuisance protection only to "the land, buildings, and machinery used in the commercial production of farm products and nursery stock"[16] and to certain defined activities characterized as "farm operation[s]."[17]  Had the General Assembly intended to extend broader protection against nuisance suits to things other than the land, buildings, and machinery used in the commercial production of farm products or nursery stock or to activities other than "farm operations," it would have used broader language than what appears in Tenn. Code Ann. § 43-26-103(a).  *Cf. Harman v.*

---

[15]The trial court reasoned that "Maple Lane Farms is an active farm operation within the meaning of a farm as described in the Right to Farm Act located at T.C.A. 43-26-103."  For its part, the Court of Appeals focused on whether Maple Lane Farms was engaging in sufficient agricultural activities to trigger the protection of the Tennessee Right to Farm Act. *Shore v. Maple Lane Farms, LLC*, 2012 WL 1245606, at *7.

[16]Tenn. Code Ann. § 43-26-102(1).

[17]Tenn. Code Ann. § 43-26-102(2).

*University of Tenn.*, 353 S.W.3d 734, 738-39 (Tenn. 2011) (noting that the legislature could have used broader triggering language had it intended a broader reach for the Whistleblower Statute).

Although we have determined that the occurrence of some farming activity at Maple Lane Farms is not sufficient to shield all activities occurring at Maple Lane Farms from nuisance suits, our work is not complete. We must still determine whether the activity being complained of in this case – the amplified music concerts – qualifies as a "farm operation" for the purpose of the Tennessee Right to Farm Act.

Resolving this question requires us to interpret and apply the provisions of the Tennessee Right to Farm Act. Our role in construing a statute is to "ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *State v. Strode*, 232 S.W.3d 1, 9 (Tenn. 2007) (quoting *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002)). To do so, we focus initially on the statute's words, giving these words their natural and ordinary meaning in light of their statutory context. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 526 (Tenn. 2010). We must avoid any "forced or subtle construction that would limit or extend the meaning of the language." *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004) (quoting *Lipscomb v. Doe*, 32 S.W.3d 840, 844 (Tenn. 2000)). Every word in a statute is presumed to have meaning and purpose, and the statute must be construed in its entirety. *U.S. Bank, N.A. v. Tennessee Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 386 (Tenn. 2009); *Eastman Chem. Co. v. Johnson*, 151 S.W.3d at 507.

If the statutory language is clear and unambiguous, we apply the statute's plain language in its normal and accepted use. *Shelby Cnty. Health Care Corp. v. Nationwide Mut. Ins. Co.*, 325 S.W.3d 88, 92 (Tenn. 2010); *Eastman Chem. Co. v. Johnson*, 151 S.W.3d at 507. However, when the statutory language is unclear, we may refer to a number of sources beyond the statutory text to aid our endeavor. We may consider, among other things, the broader statutory scheme, the history and purpose of the legislation, public policy, historical facts preceding or contemporaneous with the enactment of the statute, earlier versions of the statute, the caption of the act, and the legislative history of the statute. *Lee Med., Inc. v. Beecher*, 312 S.W.3d at 527-28; *Leggett v. Duke Energy Corp.*, 308 S.W.3d 843, 851-52 (Tenn. 2010); *In re C.K.G.*, 173 S.W.3d 714, 724 (Tenn. 2005).

**E.**

The Tennessee Right to Farm Act insulates farm operations from nuisance suits. As used in the Act, "farm operation" is a broad term intended to include all activities connected "with the commercial production of farm products or nursery stock." Tenn. Code Ann. § 43-26-102(2). The statutory definition includes specific examples of the sorts of activities

covered by the Act, and among these activities is "noise." We need not resort to dictionaries to decide that "noise" emanates from the amplified music concerts presented at Maple Lane Farms. Accordingly, the Tennessee Right to Farm Act would apply to the noise generated by the concerts at Maple Lane Farms if these concerts are somehow connected "with the commercial production of farm products or nursery stock."

Both the trial court and the Court of Appeals, considering the essentially undisputed evidence in the record, characterized the concerts at Maple Lane Farms as "marketing." The trial court observed that the concerts were "a right clever marketing operation." The Court of Appeals viewed the concerts as "a marketing and promotion effort to further the income of the farming operation and to put the farm in the minds of the public."[18] We agree with this characterization. Thus, the question becomes whether marketing activities are part of the "commercial production of farm products or nursery stock."

We find it significant that the General Assembly chose to use the word "production" alone in its definition of "farm operation." It did not include "marketing," as other states have done in similar contexts.[19] Marketing activities are not mentioned elsewhere in the Tennessee Right to Farm Act, and we have found no reference to marketing in the legislative history of the Act or any of its amendments. Based on the text and the legislative history of the Tennessee Right to Farm Act, no conclusion can be reached other than that, when it enacted the Act, the General Assembly was focused on the activities related to the production of farm products – that is to say, growing or raising these products. The General Assembly was not focused on the marketing of farm products for sale.[20]

---

[18]*Shore v. Maple Lane Farms, LLC*, 2012 WL 1245606, at *11.

[19]For example, the Ohio General Assembly's definition of "agriculture" includes the "marketing of agricultural products when those activities are conducted in conjunction with, but are secondary to, such husbandry or production." Ohio Rev. Code Ann. § 519.01 (West 2012). Relying upon this definition, the Ohio Attorney General opined that a music festival conducted on land used for producing grapes and wine would qualify as "agriculture" so long as the festival occurred together with and was of lesser importance than the production of the grapes or wine. 2002 Ohio Op. Att'y Gen. No. 2002-029, 2002 WL 31556421, at *5 (Nov. 12, 2002).

[20]We note with interest that the General Assembly maintained this focus on "production" when it defined "agriculture" twenty-three years later, in 2005. *See* Act of Mar. 21, 2005, ch. 19, § 1, 2005 Tenn. Pub. Acts 48, 48-49 (codified at Tenn. Code Ann. § 1-3-105(2) (Supp. 2012)). During the consideration of House Bill 1931 by the Agriculture Committee of the House of Representatives, Representative Bill Dunn, one of the bill's sponsors, explained that the reference to "production of farm products" limited the scope of the definition to growing or raising products, as opposed to selling products. Hearing on H.B. 1931 Before the House Comm. on Agriculture, 104th Gen. Assemb. (Mar. 8, 2005) (statement of Rep. Bill Dunn).

Despite the absence of a specific mention of "marketing" in the Tennessee Right to Farm Act, marketing activities, such as the concerts at issue in this case, could be covered by the Act if they occur "in connection with" producing (growing or raising) the farm products produced at Maple Lane Farms, such as cattle, corn, vegetables, strawberries, and pumpkins. The language of the Act provides precious little guidance with regard to the type of "connection" the General Assembly envisioned.

Noise that at first blush may not appear to be connected with the production of farm products could turn out to be just that under careful analysis. For example, "a dog next door which makes night hideous with his howls" would ordinarily be considered to be a quintessential nuisance because it interferes with the right to the undisturbed enjoyment of the premises. *Prosser & Keeton* § 87, at 619. However, the same howls by a dog guarding livestock might be protected from nuisance liability precisely because they are connected with raising the livestock. *See Hood River Cnty. v. Mazzara*, 89 P.3d 1195, 1197-99 (Or. Ct. App. 2004) (finding the barking of a dog to be a legitimate farming practice rather than a nuisance because the dog was engaged in guarding livestock). Accordingly, we will resort to the legislative history of the Tennessee Right to Farm Act to ascertain whether the General Assembly envisioned that marketing activities were somehow "connected with" the production of farm products.

Three years before it enacted the Tennessee Right to Farm Act, the General Assembly enacted statutes intended to shield feedlots, dairy farms, and egg production houses[21] from nuisance claims.[22] Subject to certain requirements and conditions, these statutes provided feedlots, dairy farms, and egg production houses with an "absolute defense" against nuisance suits. *See* Tenn. Code Ann. § 44-18-102(a).

As originally introduced, the Tennessee Right to Farm Act contained a similar provision providing an "absolute defense" to nuisance suits for farms and farm operations. Several members of the General Assembly balked at creating an absolute defense to nuisance suits for farms and farm operations.[23] Members expressed concern about allowing farmers to assert this defense after they changed their farming activities, for example, from raising

---

[21]The term "egg production house" was later amended to "poultry production house." *See* Act of Apr. 3, 2002, ch. 635, §2, 2002 Tenn. Pub. Acts 1659, 1659.

[22]Act of Mar. 29, 1979, ch. 138, 1979 Tenn. Pub. Acts 241 (codified as amended at Tenn. Code Ann. §§ 44-18-101 to -104 (2007)).

[23]For example, six senators filed amendments to exclude the counties in their districts from the bill. Debate on S.B. 1655 Before the Senate, 92nd Gen. Assemb. (Feb. 25 & Mar. 1, 1982).

crops to raising swine.[24] To address these concerns, the sponsors agreed to amend the bill to create a rebuttable presumption instead of an absolute defense.[25] This amendment enabled the sponsors to garner enough votes to enact the Tennessee Right to Farm Act.

A limited discussion of nuisances caused by noise occurred in the Senate during the debate regarding the extent to which changes in farm operations should be permitted. Senator Tommy Burks, the bill's primary Senate sponsor, explained that one purpose of the legislation was to provide nuisance protection for a change in farming practice that generated noise that a neighbor might find disturbing.[26] There was no discussion regarding noise generated by any activities other than farming.

The only other significant amendment to the Tennessee Right to Farm Act occurred in 2002.[27] The original Act had directed the Tennessee Department of Agriculture to promulgate regulations identifying "generally accepted agricultural and management practices," *see* Tenn. Code Ann. § 43-26-103(a) (Supp. 1982); however, the Department had not promulgated these regulations because of the difficulty in defining standards for varying types of farming practices throughout the State.[28] To address this circumstance, the General Assembly amended Tenn. Code Ann. § 43-26-103 to remove any reference to regulations promulgated by the Department. During the discussion of the amending legislation, several legislators expressed concern that farmers were being required to prove that their operations were not creating a nuisance even though the burden should be on the persons asserting that farming operations were creating a nuisance.[29] At no time during the consideration of this bill was there any discussion regarding the Act's application to activities other than those connected with the commercial production of farm products or nursery stock.

---

[24]Debate on S.B. 1655 Before the Senate, 92nd Gen. Assemb. (Feb. 25, 1982) (statements of Sens. Ray C. Albright, Leonard C. Dunavant, and Douglas Henry, Jr.); Hearing on H.B. 1556 Before the House Comm. on Calendar & Rules, 92nd Gen. Assemb. (Mar. 4, 1982) (statement of Rep. Jerry A. Jared).

[25]S.B. 1655, Amend. 5, 1 Senate Journal of the 92nd Gen. Assemb. of the State of Tennessee 2390-2391 (Mar. 1, 1982); Debate on S.B. 1655 Before the Senate, 92nd Gen. Assemb. (Mar. 1, 1982).

[26]Debate on S.B. 1655 Before the Senate, 92nd Gen. Assemb. (Feb. 25, 1982) (statement of Sen. Tommy Burks).

[27]Act of Apr. 3, 2002, ch. 604, 2002 Tenn. Pub. Acts 1612 (codified at Tenn. Code Ann. § 43-26-103).

[28]*See* Hearing on S.B. 2135 Before the Senate Comm. on Commerce, Labor & Agriculture, 102nd Gen. Assemb. (Jan. 29, 2002) (statement of Sen. Tommy G. Haun).

[29]*See* Hearing on S.B. 2135 Before the Senate Comm. on Commerce, Labor & Agriculture, 102nd Gen. Assemb. (Jan. 29, 2002) (statement of Sen. Tommy G. Haun).

As a general matter, we decline to broadly construe statutes that are in derogation of the common law. *See Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d at 679 (quoting *Ezell v. Cockrell*, 902 S.W.2d 394, 399 (Tenn. 1995)). The common law may not be altered by statute any further than the statute declares or necessarily requires. *Steele v. Ft. Sanders Anesthesia Grp., P.C.*, 897 S.W.2d 270, 282 (Tenn. Ct. App. 1994) (citing *Davenport v. Chrysler Credit Corp.*, 818 S.W.2d 23, 28 (Tenn. Ct. App. 1991)). Therefore, without some clear indication to the contrary, we will not presume that the General Assembly intended to change the common law by implication. *Heirs of Ellis v. Estate of Ellis*, 71 S.W.3d 705, 713 (Tenn. 2002).

Despite our diligent search, we have found nothing that suggests the General Assembly considered noise from amplified music concerts held on a farm to necessarily have a connection with producing farm products. Nor have we found any basis to conclude that the General Assembly considered music concerts to be some sort of farm operation. The plain language of the Tennessee Right to Farm Act reflects a close connection between producing farm products and the conditions or activities shielded by the Act. Accordingly, we decline to give the same broad interpretation to the Tennessee Right to Farm Act that was given by the courts below.

The essentially unrebutted evidence of Ms. Shore's case-in-chief provides a factual basis for finding that the music concerts at issue bore no relation to the production of cattle, corn, vegetables, strawberries, or pumpkins at Maple Lane Farms. Frank Leuthold, a retired professor from the University of Tennessee College of Agriculture, testified that the concerts hosted by Maple Lane Farms had nothing to do with producing its farm products. The trial court made no specific findings in this regard.[30] As such, we review the record to determine where the preponderance of the evidence lies. Simply put, Professor Leuthold's testimony is entirely consistent with our interpretation of the Tennessee Right to Farm Act, and we find no proof in the record that preponderates against his testimony. Accordingly, we conclude that the record reflects that the rebuttable presumption in Tenn. Code Ann. § 43-26-103(a) does not apply to the amplified music concerts held at Maple Lane Farms.

---

[30]With regard to Professor Leuthold, the trial court rejected his testimony that musical concerts did not qualify as a "recreational activity" under the definition of "agriculture." *See* Tenn. Code Ann. §§ 1-3-105(2)(A)(iii) (Supp. 2012) and 43-1-113(b)(1)(C) (2007). We are not concerned here with the definition of agriculture, but rather with the definition of farm operation under the Tennessee Right to Farm Act. We will address the definition of "agriculture" later in this opinion.

**F.**

Having determined that, based on the record in this case, the Tennessee Right to Farm Act does not apply to the music concerts held at Maple Lane Farms, we return to the question of whether Ms. Shore presented a prima facie case of nuisance sufficient to survive a Tenn. R. Civ. P. 41.02(2) motion for involuntary dismissal. We have determined that Ms. Shore's nuisance claim should not have been dismissed at the close of her proof.

Ms. Shore testified that concerts being held at Maple Lane Farms disrupted her use and enjoyment of her property. With regard to 2008, Ms. Shore identified two days in the spring associated with the Strawberry Jam Festival and three weekends in the fall.[31] With regard to 2009, she identified three concerts, although she did state that the music was not as loud in 2009 as it had been in earlier years.[32] With regard to 2010, Ms. Shore identified the concerts offered in conjunction with the Strawberry Jam Festival. She testified that the concerts had an adverse effect on her health, including a quickened pulse, headaches, and nausea. She also offered medical testimony from her primary care physician that the events at Maple Lane Farms significantly increased her stress level and anxiety, caused problems with her sleeping, and made life more difficult for her overall. In addition, Ms. Shore stated her belief that the activities had decreased the value of her property.

In addition to her own testimony, Ms. Shore presented the testimony of three other neighbors of Maple Lane Farms. Mr. Hartman testified that the concerts were so loud that he could not hear the television or have a telephone conversation, even when his home was completely shut. He also testified that he escaped the noise by leaving his home during the concerts. Like Mr. Hartman, Mr. Johnson stated that the concerts were so loud that he could not hear his television, even when in his basement, and that the noise prevented him from falling asleep. Also like Mr. Hartman, Mr. Johnson testified that he would often leave his home during the concerts. Finally, Ms. Hayden testified that the concerts bothered her and were so loud that she could feel vibrations in her chest. She also stated that the concerts interfered with her ability to read in her own home.

In the context of this case, nuisance liability attaches to conduct that is a legal cause of an invasion of another's interest in the use and enjoyment of land, where the invasion is substantial and unreasonable. *See Prosser & Keeton* § 87, at 622-23. In our view, Ms. Shore presented prima facie evidence of nuisance. Mr. Schmidt made a conscious decision to hold

---

[31]Ms. Shore did not specify whether there were multiple days of concerts on these fall weekends.

[32]The record suggests that the three concerts in 2009 occurred during the fall festival hosted by Maple Lane Farms. Apparently, Maple Lane Farms did not host the Strawberry Jam Festival in 2009 due to economic issues.

multiple concerts even after the Board's decision. The noise from these concerts invaded the interests of his neighbors, including Ms. Shore, in the use and enjoyment of their property. Ms. Shore was forced out of her home during daytime concerts, and she was a hostage to the noise at night. While Mr. Schmidt takes issue with Ms. Shore's failure to present testimony from others living in her particular subdivision, we do not believe such proof was required. Certainly Mr. Schmidt can put forward such proof if he believes it will be helpful to his case. Considering all the evidence currently in the record, we find that Ms. Shore presented a prima facie case of nuisance.

## IV.

We now turn to two related issues. First, we must determine whether Maple Lane Farms's use of its property for amplified music concerts qualified as "agriculture" and therefore was exempt from compliance with the Blount County Zoning Resolution. If the concerts were not exempt, we must also determine whether Ms. Shore presented a prima facie case that Mr. Schmidt had violated and was proposing to violate both the Zoning Resolution and the Board's application of the Zoning Resolution to Maple Lane Farms.

The trial court dismissed Ms. Shore's claim after deciding that the music concerts at Maple Lane Farms fit within the definition of "agriculture" in Tenn. Code Ann. §§ 1-3-105(2) and 43-1-113(b). Specifically, the trial court decided that the music concerts qualified as a recreational activity on land used for the commercial production of farm products. *See* Tenn. Code Ann. §§ 1-3-105(2)(A)(iii) and 43-1-113(b)(1)(C). Based on its interpretation of these two statutes, the trial court concluded that the Blount County Zoning Resolution did not apply to the music concerts at Maple Lane Farms because, by its own terms, the Zoning Resolution exempted agricultural uses of land from regulation. Therefore, the trial court decided that Mr. Schmidt was not required to comply with the Board's order. The Court of Appeals affirmed. *Shore v. Maple Lane Farms, LLC*, 2012 WL 1245606, at *7.

## A.

Local governments lack the inherent power to control the use of private property within their boundaries. *Ready Mix, USA, LLC v. Jefferson Cnty.*, 380 S.W.3d 52, 64 n.17 (Tenn. 2012); *Lafferty v. City of Winchester*, 46 S.W.3d 752, 757 (Tenn. Ct. App. 2000). While this power belongs to the State, the General Assembly may delegate the power to local governments. *Smith Cnty. Reg'l Planning Comm'n v. Hiwassee Vill. Mobile Home Park, LLC*, 304 S.W.3d 302, 309-10 (Tenn. 2010); *Edwards v. Allen*, 216 S.W.3d 278, 284 (Tenn. 2007).

In 1935, the General Assembly delegated to counties the power to enact zoning restrictions governing the use of the land under the jurisdiction of the county.[33] Tenn. Code Ann. § 13-7-101(a)(1) explicitly empowers county legislative bodies to enact zoning restrictions governing property "in the portions of such county which lie outside of municipal corporations." This statute grants county legislative bodies broad zoning power, *Fallin v. Knox Cnty. Bd. of Comm'rs*, 656 S.W.2d 338, 342 (Tenn. 1983), and this power has now become firmly established. *Lafferty v. City of Winchester*, 46 S.W.3d at 757-58.

However, even the 1935 legislation limited the power of county governments to regulate agricultural uses of property.[34] As it is presently codified in Tenn. Code Ann. § 13-7-114, this limitation states that:

> This part shall not be construed as authorizing the requirement of building permits nor providing for any regulation of the erection, construction, or reconstruction of any building or other structure on lands now devoted to agricultural uses or which may hereafter be used for agricultural purposes, except on agricultural lands adjacent or in proximity to state federal-aid highways, public airports or public parks; provided, that such building or structure is incidental to the agricultural enterprise. Nor shall this chapter be construed as limiting or affecting in any way or controlling the agricultural uses of land.

In 1995, the General Assembly reaffirmed this principle when it granted counties certain powers that had previously been granted to municipalities.[35] Thus, Tenn. Code Ann. § 5-1-122 (2011) provides that:

> The powers granted to counties by this part do not include the regulation of buildings used primarily for agricultural purposes; it being the intent of the general assembly that the powers granted to counties by this part should not be used to inhibit normal agricultural activities.

---

[33]Act of Feb. 12, 1935, ch. 33, 1935 Tenn. Pub. Acts 52 (codified as amended at Tenn. Code Ann. §§ 13-7-101 to -119 (2011 & Supp. 2012)).

[34]Act of Feb. 12, 1935, ch. 33, § 11, 1935 Tenn. Pub. Acts 52, 61.

[35]Act of May 11, 1995, ch. 264, § 1, 1995 Tenn. Pub. Acts 403, 403.

While local governments have considerable discretion to act within the scope of their delegated power, they cannot effectively nullify state law on the same subject by enacting ordinances that ignore applicable state laws, that grant rights that state law denies, or that deny rights that state law grants. *421 Corp. v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 36 S.W.3d 469, 475 (Tenn. Ct. App. 2000). In other words, local governments cannot wield their land use control powers in a way that conflicts with state law. *421 Corp. v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 36 S.W.3d at 476.

**B.**

Consistent with the statutory limitations on a county's zoning power, the Blount County Zoning Resolution contains an explicit agricultural exemption. Section 2.1 provides that "[a]gricultural uses . . . shall not be subject to the regulations and provisions of this Resolution as provided in Tennessee Code Annotated, Section 13-7-114." Accordingly, the Zoning Resolution does not purport to regulate agricultural uses of the land in Blount County.

Obviously, the point of contention in this case is whether the music concerts held at Maple Lane Farms constitute an agricultural use. Article 13 of the Zoning Resolution defines "agriculture" as "all forms of agriculture, growing of crops, dairying, the raising and maintaining of poultry and other livestock, horticulture, forestry, fish hatcheries and ponds, dog kennels and other small animal specialty farms, provided all health codes of Blount County and the State of Tennessee are complied with." It also contains a specific list of practices and operations that are permitted uses, but amplified music concerts are not to be found on this list. The Board determined that the music concerts at Maple Lane Farms were not an agricultural use and, therefore, were subject to regulation.

In light of the broad exclusions for all forms of agriculture found in both state law and the Zoning Resolution, we must determine whether music concerts qualify as "agriculture" under state law. Tenn. Code Ann. § 1-3-105(2)(A)[36] defines "agriculture" as

> (i)    The land, buildings and machinery used in the commercial production of farm products and nursery stock;
> (ii)    The activity carried on in connection with the commercial production of farm products and nursery stock; and
> (iii)    Recreational and educational activities on land used for the commercial production of farm products and nursery stock.

---

[36]*See also* Tenn. Code Ann. § 43-1-113(b)(1).

-24-

The General Assembly explicitly directed that this definition shall be used throughout the Tennessee Code "unless a different definition is specifically made applicable." Tenn. Code Ann. § 43-1-113(a). Mr. Schmidt asserts that his music concerts qualified as "recreational activities" on land used for the commercial production of farm products. This issue, like the one involving the intended scope of the Tennessee Right to Farm Act, is one that requires us to interpret and apply the applicable statutes.

## C.

It was not until 2005 that the legislature defined "agriculture."[37] This definition includes "[r]ecreational . . . activities on land used for the commercial production of farm products and nursery stock." Tenn. Code Ann. §§ 1-3-105(2)(A)(iii) and 43-1-113(b)(1)(C). The General Assembly did not provide much, if any, guidance with regard to the meaning of "recreational activities." Accordingly, we must again employ the canons of statutory construction to divine what the General Assembly intended "recreational activities" to include.

The history of the 2005 legislation fails to illuminate this question. The legislative history includes no discussion of recreational activities. What little discussion there was focused on the fact that the Tennessee Code did not contain a definition of "agriculture" even though the word appeared in the State Seal.[38] More broadly, Title 43 of the Tennessee Code, which contains the statutes pertaining to agriculture and horticulture, makes no mention of "recreational activities." Looking more broadly to the entire Tennessee Code, it appears that the meaning of the word "recreational" varies depending on the context in which it is used.[39]

With no clear statutory guidance for determining whether attending a music concert is a "recreational activity" for the purpose of Tenn. Code Ann. §§ 1-3-105(2)(A)(iii) and 43-

---

[37] See Act of Mar. 21, 2005, ch. 19, 2005 Tenn. Pub. Acts 48 (codified at Tenn. Code Ann. §§ 1-3-105(2) and 43-1-113(b)).

[38] Hearing on H.B. 1931 Before the House Comm. on Calendar & Rules, 104th Gen. Assemb. (Mar. 17, 2005) (statement of Rep. Eugene E. Davidson); Hearing on S.B. 2207 Before the Senate Comm. on Commerce, Labor & Agriculture, 104th Gen. Assemb. (Mar. 15, 2005) (statement of Sen. Charlotte Burks).

[39] See, e.g., Tenn. Code Ann. § 11-7-103(a) (2012) (identifying certain recreational purposes as a basis for making tracts of land eligible for conservation and protection under the Tennessee Heritage Conservation Trust Fund); Tenn. Code Ann. § 11-10-101(6) (2012) (defining "recreational purposes" with regard to the liability of landowners who lease their property to the State for recreational purposes); Tenn. Code Ann. § 11-25-104(1) (2012) (identifying certain "recreational opportunities" as "adventure tourism activities" for the purpose of the Doe Mountain Recreation Authority Act of 2012); Tenn. Code Ann. § 70-7-102(a) (2012) (limiting the liability of landowners to persons engaging in "recreational activities" on the property without the landowner's permission).

1-113(b)(1)(C), Ms. Shore argues that attending a music concert is not a recreational activity because other definitions of recreational "activities" or "uses" that appear elsewhere in the Tennessee Code often reflect that recreational activities are active, rather than passive. Professor Leuthold even testified that he did not consider listening to music to be a recreational activity because it was passive rather than active. The trial court dismissed this argument by noting "quite frankly I think going to music concerts is a form of recreation."

The Court of Appeals took another tack. After recognizing that "agriculture is changing and evolving," *Shore v. Maple Lane Farms, LLC*, 2012 WL 1245606, at *11, the court found guidance in the statutes enacted in 2009[40] for the purpose of limiting the liability of "agritourism professionals." The General Assembly defined an "agritourism professional" as "any person who is engaged in the business of providing one (1) or more agritourism activities." Tenn. Code Ann. § 43-39-101(2). It also defined "agritourism activity" as

> any activity carried out on a farm or ranch, eligible for greenbelt classification under title 67, chapter 5, part 10, that allows members of the general public, *for recreational, entertainment or educational purposes*, to view or enjoy rural activities, including farming, ranching, historic, cultural, harvest-your-own activities or natural activities and attractions. An activity is an "agritourism activity" whether or not a participant provides compensation in money or other valuable compensation to participate in the activity. "Agritourism activity" includes an activity involving any animal exhibition at an agricultural fair, regardless of the location of the fair[.]

Tenn. Code Ann. § 43-39-101(1) (emphasis added). Based on its interpretation of Tenn. Code Ann. § 43-39-101(1), the Court of Appeals concluded that the "legislature clearly considers agritourism to be the equivalent of agriculture" and that the "activities at [Maple Lane Farms] meet the definition of agritourism." *Shore v. Maple Lane Farms, LLC*, 2012 WL 1245606, at *12. Based on these conclusions, the court reasoned that "agritourism activities" at Maple Lane Farms must be considered "agriculture" for the purpose of Tenn. Code Ann. §§ 1-3-105(2)(A)(iii) and 43-1-113(b)(1)(C) and, therefore, must be exempt from compliance with Blount County's Zoning Resolution under Tenn. Code Ann. § 13-7-114 and Section 2.1 of the Zoning Resolution. *Shore v. Maple Lane Farms, LLC*, 2012 WL 1245606, at *11-13.

---

[40] Act of June 2, 2009, ch. 498, 2009 Tenn. Pub. Acts 669 (codified at Tenn. Code Ann. §§ 43-39-101 to -103 (Supp. 2012)).

We agree with the Court of Appeals's observation that "agriculture is changing and evolving." We also agree that many of the activities taking place at Maple Lane Farms qualify as "agritourism activities."[41] However, we respectfully disagree with the Court of Appeals's conclusion that all activities that qualify as "agritourism activities" for the purpose of the liability limitations in Tenn. Code Ann. § 43-39-102 must also be considered "agriculture" for the purpose of the exemption from local land use requirements under either Tenn. Code Ann. § 13-7-114 or Section 2.1 of the Blount County Zoning Resolution.

The purposes of these two sets of statutes are entirely unrelated. The zoning statutes strike a balance between farming and the ability of counties to reasonably regulate the use of the property in the county outside of incorporated municipalities.[42] The purpose of the agritourism statutes, on the other hand, is to limit the liability of "agritourism professionals" for injuries to persons who come to their property to enjoy corn mazes, hayrides, pick-your-own pumpkin and strawberry patches, and other agritourism activities. Because these purposes are so different, we cannot, without some legal basis, presume that the General Assembly balanced the competing interests on each occasion in precisely the same way.

In fact, Tenn. Code Ann. § 43-39-101(1)'s definition of "agritourism activity" reflects that the General Assembly took a broader view in 2009 of the activities it desired to shield from liability than it did with regard to the activities or uses it intended to shield from county zoning regulations. In its definition of "agritourism activity," the General Assembly expressly included activities "carried out on a farm . . . for . . . entertainment . . . purposes," as well as for recreational or educational purposes. While the definitions of "agriculture" in both Tenn. Code Ann. § 1-3-105(2)(A)(iii) and Tenn. Code Ann. § 43-1-113(b)(1)(C) include recreational and educational activities, they do not specifically include "entertainment activities."

The language of these statutes reflects that the General Assembly was aware of the distinction between entertainment activities on one hand and recreational and educational activities on the other. The inclusion of the word "entertainment" in Tenn. Code Ann. § 43-39-101(1) reflects the General Assembly's clear purpose to shield farmers from liability for injuries to persons who come onto their property for the purpose of entertainment. However,

_____

[41]The legislative history of the agritourism statutes reflects that the members of the General Assembly used corn mazes and pick-your-own pumpkin patches as examples of an agritourism activity. Similarly, the brief submitted by the Amicus Curiae refers to on-farm festivals, pumpkin patches, and corn mazes. *See also* Kim Jensen, et al., *Agri-tourism in Tennessee: Current Status and Future Growth, 2003-2004*, at 8 (July 13, 2005), http://web.utk.edu/~aimag/pubs/agritour.pdf (identifying common agritourism attractions as including on-farm retail markets, on-farm restaurants, on-farm tours, pick-your-own farms, farm festivals and fairs, pumpkin patches, cut-your-own Christmas trees, and on-farm petting zoos).

[42]Tenn. Code Ann. § 13-7-103 sets out the purposes of county zoning regulations.

because the General Assembly did not undertake to amend the definition of "agriculture" when it enacted the agritourism statutes in 2009, we must interpret and apply Tenn. Code Ann. §§ 1-3-105(2) and 43-1-113(b) according to their plain language. While these statutory definitions of "agriculture" include recreational and educational activities, they do not include entertainment activities. Therefore, entertainment activities occurring on a farm are not an agricultural use that exempts the related land, buildings, or other structures from local zoning regulation under Tenn. Code Ann. § 13-7-114.

We note that our interpretation and application of Tenn. Code Ann. §§ 1-3-105(2) and 43-1-113(b) are consistent with the conclusions reached by other courts in similar circumstances. For example, a farmer in Ohio offered haunted hayrides during the Halloween season that featured amplified horror sounds, flashing lights, and actors dressed in costumes. *Columbia Twp. Bd. of Zoning Appeals v. Otis*, 663 N.E.2d 377, 377 (Ohio Ct. App. 1995). The local zoning inspector ordered the farmer to shut down the hayrides in response to the neighbors' complaints about the noise. In rejecting the farmer's argument that the haunted hayrides were an agricultural use of the property, the Ohio Court of Appeals held that "[t]he shrieks and flashing lights from Otis's farm were completely inconsistent with traditional agricultural activity. Therefore, the haunted hayride could not be considered the use of property for an agricultural purpose." *Columbia Twp. Bd. of Zoning Appeals v. Otis*, 663 N.E.2d at 379.

A Pennsylvania court was presented with a similar dispute regarding the use of a farm for "Spring Flings" for local college students, rock concerts, and van shows. *In re Stagebrush Promotions, Inc.*, 512 A.2d 776, 778 & n.1 (Pa. Commw. Ct. 1986). These activities drew large crowds and generated considerable noise. The owner of the property, which had been zoned for agricultural use, sought a conditional use permit after being informed that he was in violation of the local zoning ordinance. The court upheld the denial of the conditional use permit after noting that agricultural zoning was intended to permit "only those land uses which are agricultural in character or which act in direct support of [agricultural] activity," *In re Stagebrush Promotions, Inc.*, 512 A.2d at 779, and that it was "unable to discern how the various, concurrent activities proposed in the [conditional use permit] work 'in direct support,' or in stabilization of agricultural activities," *In re Stagebrush Promotions, Inc.*, 512 A.2d at 781.

**D.**

The trial court record reflects that the parties considered the amplified music concerts being held at Maple Lane Farms to be entertainment. For his part, Mr. Schmidt, from the early days of the controversy, characterized the issue as "whether the entertainment provided at Maple Lane Farms would be considered within the realm of agriculture." The record also reflects that Mr. Schmidt had presented and planned to continue to present more music

concerts at Maple Lane Farms than had been permitted by the Board's January 3, 2008 order and that this order had become final with regard to Maple Lane Farms because Mr. Schmidt had elected not to appeal it to the courts.

We have determined as a matter of statutory interpretation that the music concerts presented at Maple Lane Farms do not fall within the rubric of "agriculture" as that word is currently defined. Therefore, the music concerts presented at Maple Lane Farms cannot claim the benefit of Tenn. Code Ann. § 13-7-114's exemption from compliance with Blount County's Zoning Resolution. Without this exemption, Ms. Shore's evidence establishes that Mr. Schmidt has violated both the Blount County Zoning Resolution and the Board's January 3, 2008 order. Accordingly, the trial court erred by dismissing Ms. Shore's claim in accordance with Tenn. R. Civ. P. 41.02(2).

## V.

We reverse the judgments of the trial court and the Court of Appeals involuntarily dismissing Ms. Shore's complaint based on Tenn. R. Civ. P. 41.02(2) and remand the case for further proceedings consistent with this opinion. We tax the costs of this appeal to Robert Schmidt, for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUSTICE