

**FILED**

**December 29, 2016**

TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

Time: 12:32 P.M.



**TENNESSEE BUREAU OF WORKERS' COMPENSATION**
**WORKERS' COMPENSATION APPEALS BOARD**

| | |
|---|---|
| Thomas Petty ) | Docket No.  2016-06-0841 |
| ) | |
| v. ) | State File No. 20550-2015 |
| ) | |
| Convention Production Rigging, et al. ) | |
| ) | |
| ) | |
| Appeal from the Court of Workers' ) | |
| Compensation Claims ) | |
| Joshua D. Baker, Judge ) | |

---

**Affirmed and Remanded - Filed December 29, 2016**

---

The employee alleges suffering injuries to multiple parts of his body when a stanchion and heavy draping fell on him while he was helping disassemble a stage. The claim was accepted as compensable, but after multiple evaluations by authorized physicians resulted in no recommendations for further treatment, the employer denied the employee's requests for further evaluation. Following an expedited hearing, the trial court found that the employee had not presented sufficient evidence that he would likely prevail at a trial on the merits in establishing a need for additional treatment and denied the employee's requests for additional evaluations. The employee has appealed. Having carefully reviewed the record, we affirm the trial court's decision and remand the case for further proceedings as may be necessary.

Judge David F. Hensley delivered the opinion of the Appeals Board in which Presiding Judge Marshall L. Davidson, III, and Judge Timothy W. Conner joined.

D. Andrew Saulters, Nashville, Tennessee, for the employee-appellant, Thomas Petty

Michael L. Haynie, Nashville, Tennessee, for the employer-appellee, Convention Production Rigging

**Factual and Procedural Background**

On March 7, 2015, Thomas Petty ("Employee") was injured when a stanchion and heavy draping fell approximately twenty feet and struck him on the head and right

1

shoulder while he was helping disassemble a stage at the Opryland Hotel. Convention Production Rigging ("Employer") accepted the claim as compensable and provided medical and temporary disability benefits. Employee was initially seen at a Concentra medical facility on March 10, 2015 with complaints of a head injury, reporting that he was injured when a "pipe and drape fell and hit [his] head." He was diagnosed with "[f]ace/scalp contusion" and "[m]astoid air space contusion."

Employee returned to Concentra on March 12, 2015 for a recheck, reporting that he had been working full duty and taking his medications, but had "no relief in pain." He complained of headaches caused by elevation in blood pressure or strenuous activity, which he claimed caused him to leave work early to return to Concentra "with persistence/progression of symptoms." Because of his complaints and the assessment of a concussion, Employee was instructed by Dr. Joseph E. Benson at Concentra to proceed to an emergency room. At Summit Medical Center emergency room, Employee reported suffering a head injury and experiencing nausea that was exacerbated by movement. He complained of a headache and being dizzy. A CT scan of his cervical spine revealed degenerative changes, and a CT scan of his head revealed no acute intracranial findings.

Employer provided a panel of neurosurgeons from which Employee chose Dr. Jason Hubbard in August 2015. He first saw Dr. Hubbard on September 11, 2015, complaining of continued headaches, neck pain, and right shoulder pain. He also complained of numbness and tingling in his arms if he turned his head a certain way and he reported significant pain with passive range of motion of the right shoulder. Based on these reports, Dr. Hubbard suspected Employee's complaints could be originating in his shoulder. He ordered a cervical MRI and indicated in his report that he thought Employee "needs to be seen by orthopedics to have his [right] shoulder joint evaluated." Employer provided a panel of orthopedics for Employee to select an orthopedic physician.

Employee returned to Dr. Hubbard on October 14, 2015. Dr. Hubbard noted that the MRI showed Employee had some mild bulging discs, but stated in his report that "I do not see anything here that needs to be surgically addressed." He recommended physical therapy and cervical epidural blocks.

On October 20, 2015, Employee saw Dr. David Moore, an orthopedist selected from a panel, for his right shoulder complaints. Dr. Moore noted that Employee reported pain in his shoulder and that he experienced increased symptoms with overhead activity, lifting, and shoulder elevation. He also noted that Employee was treating with another physician "for his cervical spine." Dr. Moore diagnosed Employee with right shoulder pain and ordered an MRI to rule out a rotator cuff tear. Based on X-rays, Dr. Moore determined that Employee had a "type 2 acromion with moderate AC joint degenerative changes," and he concluded that "at a minimum [Employee] appears to be struggling with traumatic impingement syndrome to his right shoulder."

2

Employee began physical therapy on November 9, 2015, as recommended by Dr. Hubbard, and he also received a cervical epidural block, which Dr. Hubbard also prescribed. Following his epidural block, Employee reported constant headaches that began very quickly following the block. Based on Employee's reports, Dr. Hubbard ordered a CT scan and MRI of his head, which were interpreted as "normal." Dr. Hubbard noted in a November 13, 2015 report that Employee's headaches "are certainly not the typical low-pressure headaches [and] I am unsure why he is having these headaches." Because of Employee's reports, Dr. Hubbard referred him "to [n]eurology to have him further evaluated." On November 30, 2015, Employee selected Dr. Steven Graham from a panel of neurologists.

Employee was initially seen by Dr. Graham for his ongoing neurological complaints on December 22, 2015. He complained of memory problems, light sensitivity, difficulty wearing hats dues to scalp pain, daily headaches, difficulty swallowing, low energy, and poor sleep. He also reported occasional stuttering and slurred speech. Dr. Graham noted that Employee's clinical presentation was "most consistent with mild grade 1 concussion in March 2015." He also observed that it was "difficult to explain why he continues to have ongoing numerous symptoms" and recommended a full neuropsychological evaluation because of Employee's "ongoing memory and cognitive complaints."

Employee continued to follow up with Dr. Graham monthly while the neuropsychological evaluation was being arranged. At a March 4, 2016 follow-up visit with Dr. Graham, Employee reported he had been using a high frequency ultrasonic device to help train his new dog and that the device caused him to go into a daze that took him five days "to get over." On March 7, 2016, Employee saw a clinical neuropsychologist, James S. Walker, for the recommended neuropsychological evaluation. Dr. Walker observed that Employee's chief complaint was headache, noting that Employee had unusual reactions to certain noises. In particular, he noted Employee's report that using the ultrasonic dog training device had put him into a "fog for five days," causing him to become disoriented.

The neuropsychological evaluation with Dr. Walker included numerous tests including "performance validity testing." Based on the performance validity tests, Dr. Walker concluded Employee was "consciously feigning the presence of difficulties," reporting the following concerning the ultrasonic dog training device:

> Mr. Petty brought the ultrasonic dog training device to the session that he said had caused him so many problems when he used it a few days ago. During the course of his examination, one of the examiners surreptitiously carried the device while turned on into the room where Mr. Petty was undergoing evaluation. We actually brought the device within 2 feet of his head on one occasion, and walked back and forth on several occasions in

3

his presence with the device turned on. At no point did he register any acknowledgment that he was hearing anything at all, or having the least degree of distress. Later in the testing session, we introduced the device after announcing its presence, and at his suggestion turned it on in order to see the effect. The instant it was turned [on], he began to complain vociferously of tremendous distress. We then administered another performance validity test to him, which he failed badly.

Dr. Walker's diagnostic impression was "[m]alingering." His conclusions included, "[Employee] did not suffer from a serious head injury on March 8, 2015," and his report noted that, "[b]y any measure, this would be rated as a very mild head injury.[1] It is certainly not the sort of injury that we would expect to go on to result in longstanding impairment." Dr. Walker also concluded that Employee was "cannabis dependent," stating that he "uses marijuana daily, at least two to three times a day." Dr. Walker suspected that "some of [Employee's] cognitive complaints are related to his frequent and persistent intoxication, rather than to the effects of any head injury."

Employee returned to the neurosurgeon, Dr. Hubbard, on March 11, 2016 with continued complaints of neck pain. Dr. Hubbard diagnosed Employee with non-specific neck pain, stating,

I do not have any anatomical explanation [for] his pain. I think he just has chronic neck pain. There is nothing here that needs to be surgically addressed. I will get him over to pain management. He is at his maximum medical improvement. I have no restrictions on him.

Employee returned to Dr. Graham on April 13, 2016, in follow-up for the neuropsychological testing. Dr. Graham noted that the testing was consistent with malingering and that there was "no specific neuropathological disorder" that would correlate to Employee's subjective symptoms. He opined that Employee's clinical presentation was consistent with malingering, placed Employee at maximum medical improvement, and assigned no permanent impairment ratings or restrictions. He also opined that he was "unaware of any additional evaluations or treatments which would be of any value at this time."

On April 19, 2016, the MRI of Employee's right shoulder, which had been ordered in October 2015 by Dr. Moore, was performed. At his follow-up appointment with Dr. Moore on April 26, 2016, Dr. Moore observed that Employee had been cleared with respect to his head and neck injuries and that his neuropsychological testing was consistent with malingering. He noted that the MRI revealed a degenerative labral tear

---

[1] Dr. Walker's report and an affidavit of Dr. Moore refer to a March 8, 2015 work injury. The parties acknowledge the work accident to have occurred on March 7, 2015.

4

with a small cyst, and he diagnosed Employee with right shoulder pain and impingement syndrome of the right shoulder. He opined that the labral tear was an incidental finding and that the mechanism of injury described by Employee was not likely to have caused the objective findings seen on the MRI. He opined that Employee had suffered a shoulder contusion and recommended an aggressive course of physical therapy.

Employee saw Dr. Jeffrey Hazlewood for pain management evaluation on May 12, 2016. He complained of headaches, neck pain, right shoulder pain, and memory problems, and he also reported having "pain rages." Dr. Hazlewood's May 12, 2016 report includes the first mention of foot and knee pain, stating that in addition to the neck and right shoulder pain Employee complained of "right foot and left knee pain since the injury." Dr. Hazlewood observed significant abnormal pain behavior on examination and stated that the range of motion deficits seen on exam were far out of proportion to the imaging studies. The report states that Employee demonstrated non-anatomical sensory deficits and significant overreaction with no objective explanation. Dr. Hazlewood opined that Employee's "subjective symptoms far outweigh objective findings, and one must strongly consider malingering in this case."

At his second appointment with Dr. Hazlewood on May 24, 2016, Employee's complaints were unchanged. Dr. Hazlewood noted that Employee's symptoms could not be explained and that he had strong concerns about malingering in the face of normal objective testing. Dr. Hazlewood documented positive Waddell's signs and released Employee from pain management, noting that he was still under treatment with Dr. Moore for his shoulder.

Employee returned to Dr. Moore on June 14, 2016 for re-evaluation. Dr. Moore noted Employee had no improvement with physical therapy and opined that Employee's workup was consistent with malingering. He reiterated his opinion that the mechanism of injury described by Employee would not have caused the findings seen on Employee's right shoulder MRI. He released Employee at maximum medical improvement with no medical impairment and no restrictions.

At Employee's request, Dr. Stephen Neely, an orthopedic surgeon, performed an examination on July 8, 2016. His report recites Employee's report of injury and the course of his medical treatment, ultimately assigning an impairment rating. Dr. Neely thought it was significant that the previous medical providers "seemed to have focused on the posterior superior labral tear whereas there is a large inferior tear which well could have been produced by this mechanism of injury." He recommended that Employee seek a second opinion with respect to his shoulder "to again evaluate the findings on the MRI scan."

The parties deposed Dr. Neely. He testified that if Employee had been his patient, he "would probably have given him the option to have a shoulder arthroscopy, a removal

of the paralabral cyst, and a labral repair." He testified the cyst was "caused by the injury" and formed after the injury. He testified the mechanism of injury as described to him is "certainly consistent [with a labral tear in] that it pushed the humeral head inferiorly and pinched the labrum." When asked "given the objective findings on the MRI, would a second opinion on the shoulder be appropriate," he testified he "would get a second opinion." He testified that both Employee's neck condition and his right shoulder condition are causally related to the March 7, 2015 work incident, noting that the shoulder condition is "even clearer."

In contrast to the deposition testimony of Dr. Neely, Employer submitted an affidavit of Dr. Moore, who acknowledged the labral tears and the cyst that were noted in Employee's right shoulder MRI. However, he reiterated the opinion in his written report that the labral tears were an incidental finding not causally related to the work injury. He further opined in the affidavit that surgery would not be beneficial to Employee and that, even if surgery was performed, it would not be related to the work injury. Employer denied Employee's request for a second opinion addressing Employee's neck and shoulder injuries, and it denied Employee's request for a panel of physicians for Employee's alleged right foot and left knee injuries.

The trial court issued an order on November 18, 2016 denying Employee's request for additional evaluations. The court found that Employee had not come forward with sufficient evidence that he was likely to succeed in proving that his labral tears were causally related to the employment and that he had not established he was entitled to treatment for an alleged foot injury or that he was entitled to return to Dr. Moore for additional treatment of his shoulder. Employee has appealed.

## Standard of Review

The standard we apply in reviewing a trial court's decision is statutorily mandated and limited in scope. Specifically, "[t]here shall be a presumption that the findings and conclusions of the workers' compensation judge are correct, unless the preponderance of the evidence is otherwise." Tenn. Code Ann. § 50-6-239(c)(7) (2015). The trial court's decision may be reversed or modified if the rights of a party "have been prejudiced because findings, inferences, conclusions, or decisions of a workers' compensation judge:

(A) Violate constitutional or statutory provisions;
(B) Exceed the statutory authority of the workers' compensation judge;
(C) Do not comply with lawful procedure;
(D) Are arbitrary, capricious, characterized by abuse of discretion, or clearly an unwarranted exercise of discretion; or
(E) Are not supported by evidence that is both substantial and material in the light of the entire record."

6

Tenn. Code Ann. § 50-6-217(a)(3) (2015).

**Analysis**

On appeal, Employee asserts the trial court erred in denying the benefits he sought in four respects: (1) medical treatment for his foot and knee injuries; (2) additional medical treatment for his concussion/head injury; (3) additional medical treatment for his neck injury; and (4) additional treatment for the right shoulder injury.

Initially, we note that an employee bears the burden of proof on every essential element of his or her claim. *Buchanan v. Carlex Glass Co.*, No. 2015-01-0012, 2015 TN Wrk. Comp. App. Bd. LEXIS 39, at *6 (Tenn. Workers' Comp. App. Bd. Sept. 29, 2015). While the burden of proof at an expedited hearing is more relaxed than that at a hearing on the merits, the employee is not relieved of the "burden of producing evidence of an injury by accident that arose primarily out of and in the course and scope of employment at an expedited hearing." *Id.* at *6.

*Evaluation and Treatment of the Right Foot and Left Knee*

Employee asserts the trial court erred in denying medical benefits for his alleged right foot and left knee injuries, which he contends occurred when he tried to "leap and get out of the way" to avoid being hit by the falling stanchion and drape. He testified he reported his injuries to Employer and that he told the adjuster about the foot and knee injuries, but "because my head was more important than the rest of my body" he states he was told "we'll take care of [the foot and knee] later." Employee asserts the trial court "denied treatment on the basis that the First Report of Work Injury did not contain information concerning a foot injury."

Contrary to Employee's argument, the trial court denied treatment for his foot and knee based on his failure to show that he suffered a compensable injury to his foot or that additional medical care was reasonable and necessary, noting that "neither the medical records nor the First Report of Injury indicates that [Employee] injured his foot in the workplace accident." The trial court noted that the medical records contain no information concerning a foot injury until Employee had been treating with "various physicians over several months." In fact, there is no mention in the medical records of injuries to Employee's foot or knee until May 12, 2016, more than a year after the work accident. Moreover, the trial court correctly noted that Employee's own physician, Dr. Neely, who testified concerning Employee's *left* foot injury without mentioning his right foot or left knee injury, "opined that [Employee] has attained maximum medical improvement from the foot condition." Expert proof addressing the reasonableness or necessity for any medical care for Employee's right foot or left knee is absent from the record. Accordingly, the preponderance of the evidence supports the trial court's denial

7

of Employee's request for a panel of physicians to treat any alleged injuries to his right foot and left knee.

*Additional Treatment for the Concussion/Head Injury*

Employee asserts that "based upon [his] unrefuted testimony . . . that he is continuing to have headaches and concussion related symptoms, he should be afforded . . . additional treatment for his compensable head injury." Additionally, Employee contends he is entitled to a second opinion on the issue of diagnosis as provided in Tennessee Code Annotated section 50-6-204(a)(3)(C) (2015). We disagree.

Following Employee's presentation to Summit Medical Center, he selected Dr. Hubbard as his authorized treating physician from a panel of neurosurgeons. Dr. Hubbard reviewed the CT scan from Summit Medical Center and based upon his examination of Employee, it was his suspicion that "a lot of [Employee's] symptoms [were] coming from the shoulder joint itself." However, because of Employee's complaints of numbness and tingling in his body, Dr. Hubbard recommended an MRI as well as referral to an orthopedic for evaluation of the shoulder. Although the MRI showed some mild disc bulging, according to Dr. Hubbard there was no significant compression, and Dr. Hubbard concluded that he did not "see anything here that needs to be surgically addressed." He recommended conservative treatment to include physical therapy and cervical epidural blocks. Because of reports of headaches that "came on very quickly after his initial epidural block," Dr. Hubbard requested an MRI of Employee's brain, which was interpreted as normal. Due to Dr. Hubbard's uncertainty as to why Employee was having headaches, he referred Employee for a neurology consult.

Following neurological evaluation and treatment by Dr. Graham and subsequent neuropsychological testing, Employee returned to Dr. Hubbard in March 2016 with continuing complaints of "neck pain despite epidural blocks and physical therapy." Noting that Employee's previous imaging studies were normal, Dr. Hubbard again indicated "there is nothing here that needs to be surgically addressed," placed Employee at his maximum medical improvement, and recommended him for pain management. He placed no restrictions on Employee and offered to "see him in the future if there is anything else [he] can address." The neurologist, Dr. Graham, saw Employee in follow-up the next month. Noting that Employee's "presentation is consistent with malingering," Dr. Graham "placed [Employee] at maximum medical improvement from a neurological perspective," commenting he was "unaware of any additional evaluations or treatments which would be of any value at this time." Dr. Graham released Employee to return to work with no neurological restrictions or limitations.

Neither the records of Dr. Hubbard nor Dr. Graham suggest the need for additional treatment for Employee's concussion or head injury. Although Employee's medical expert, Dr. Neely, stated in his report that he thought Employee should have a second

8

opinion on his shoulder, neither his report nor his deposition testimony suggests that Employee is in need of additional treatment as a result of a concussion or head injury. Accordingly, Employee's insistence that he is entitled to additional treatment for his concussion or head injury is not persuasive.

Turning to Employee's assertion that he is entitled to a second opinion on the issue of his diagnosis as provided in Tennessee Code Annotated section 50-6-204(a)(3)(C), we do not interpret this section as suggested by Employee. As noted by the trial court, "[e]ssentially, the statute allows for a second opinion on the issue of surgical necessity to repair an injury caused by a workplace accident." The statute provides that "the employee shall be entitled to have a second opinion on the issue of surgery and diagnosis"; however, "[o]ur role in construing a statute is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope. To do so, we focus initially on the statute's words, giving these words their natural and ordinary meaning in light of their statutory context. We must avoid any forced or subtle construction that would limit or extend the meaning of the language. Every word in a statute is presumed to have meaning and purpose, and the statute must be construed in its entirety." *Shore v. Maple Lane Farms, LLC*, 411 S.W.3d 405, 420-21 (Tenn. 2013) (citations omitted) (internal quotation marks omitted). The complete sentence from which Employee asserts he has the right to a second opinion on the issue of diagnosis is as follows:

> When the treating physician or chiropractor refers the injured employee, the employee shall be entitled to have a second opinion on the issue of surgery and diagnosis from a physician or chiropractor *from a panel of two (2) physicians practicing in the same specialty as the physician who recommended the surgery*.

Tenn. Code Ann. § 50-6-204(a)(3)(C) (2015) (emphasis added). We find the final phrase of this sentence to be of particular significance in the context of this case. The phrase "as the physician who recommended the surgery" necessarily requires there to be an opinion of a specialist recommending surgery before an injured worker is entitled to a second opinion on the issue of surgery and diagnosis. Here, none of the authorized treating doctors recommended surgery. Accordingly, we find no merit in Employee's insistence that he is entitled to a second opinion on the issue of diagnosis.

*Additional Treatment for the Cervical Injury*

Employee's third issue questions whether he is entitled to additional treatment for his cervical injury. Employee asserts that the trial court erred in failing to order such treatment and that it erred in stating in its order that Employee "did not request additional treatment for his neck" in the Dispute Certification Notice ("DCN"). Although Employee identified "additional treatment for the neck" in the "Additional Issues"

presented in the DCN, we conclude that any error in the trial court's statement was remedied by the trial court's determination, as stated in its order, that "[s]o far as [Employee] sought additional treatment for his neck in this proceeding, the Court holds that [Employee] failed to carry his burden of proving the reasonable medical necessity of additional treatment." While Employee testified that he continued to experience neck pain, we agree with the trial court that the record is devoid of medical proof of the reasonableness and necessity of additional medical treatment for the neck.

*Additional Treatment for the Shoulder Injury*

Finally, Employee takes a three-pronged approach in arguing the trial court erred in denying additional medical treatment for his right shoulder injury. First, he contends the diagnostic studies confirmed that he had two labral tears, but that Dr. Moore, the authorized treating doctor, only addressed the posterior tear in his medical records and did not address the inferior labral tear until he completed an affidavit following Dr. Neely's deposition. Second, Employee asserts the trial court "did not consider the ultimate causation question" presented to Dr. Neely, insisting "Dr. Neely testified unequivocally that the large paralabral cyst found on the MRI was directly related to the accident." Third, Employee contends the trial court applied the wrong standard to Dr. Neely's testimony by requiring proof that met the standard of a cumulative trauma accident rather than a specific event of trauma as addressed in Tennessee Code Annotated section 50-6-102(14) (2016). Employee argues that with the application of the appropriate standard, the preponderance of the medical evidence supports his position that the trial court erred in denying the additional treatment. We disagree.

Although the records of Employee's visits with Dr. Moore do not address a second labral tear indicated by the April 2016 MRI, Dr. Moore addressed both tears in his affidavit, noting that he reviewed the "actual scan of the April 19, 2016 MRI, rather than just the report." In the affidavit, he opined that Employee "sustained a contusion to his right shoulder as a result of the March 8, 2015 accident." He confirmed he was "aware that the MRI reveal[ed] posterior and inferior labral tears," and stated that the tears "are an incidental finding . . . consistent with age related degeneration of the labrum consistent with an individual of [Employee's] age." He opined that the work accident "did not contribute more than 50% in causing the findings on the April 19, 2016 MRI, including the labral tears, considering all causes." Dr. Moore's affidavit additionally addressed what the doctor described as Employee's "pre-existing conditions" as revealed in the MRI, stating those pre-existing conditions "were not aggravated by the [work] accident." Additionally, he opined that Employee "does not have a condition or injury of his shoulder that requires surgery," and that he "do[es] not recommend that [Employee] undergo surgery of the labral tears." Dr. Moore addressed his treatment for the shoulder, stating he "prescribed a non-surgical course of medical treatment . . . including physical therapy and non-steroidal anti-inflammatory medication," and that "the only treatment

[Employee] would need in the foreseeable future for the work related contusion" is the home exercise program that he recommended.

In contrast to Dr. Moore's medical records and affidavit, Dr. Neely testified that the work accident could have caused the labral tears. Employee contends the trial court failed to consider "the ultimate causation question" asked of Dr. Neely:

Q: Tell us about this – the large paralabral cyst. Is that consistent with his injury or is that aggravated by the injury? What is the significance of that?

A: I think it is caused by the injury. The cyst forms after the injury.

Q: Okay. Tell us how that happens. How does the cyst –

A: The body responds to scarring and the cyst develops in the tear.

While this exchange supports the assertion that the work injury caused the cyst to develop, the trial court has the discretion to accept the opinion of one expert over another. *Sanker v. Nacarato Trucks, Inc.*, No. 2016-06-0101, 2016 TN Wrk. Comp. App. Bd. LEXIS 27, at *11-12 (Tenn. Workers' Comp. App. Bd. July 6, 2016). As stated by the Tennessee Supreme Court, "[w]hen faced . . . with conflicting medical testimony . . ., it is within the discretion of the trial judge to conclude that the opinion of certain experts should be accepted over that of other experts and that it contains the more probable explanation." *Thomas v. Aetna Life and Cas. Co.*, 812 S.W.2d 278, 283 (Tenn. 1991) (internal quotation marks omitted). Moreover, Tennessee Code Annotated section 50-6-102(14)(E) (2016) provides that the "opinion of the treating physician, selected by the employee from the employee's designated panel of physicians . . ., shall be presumed correct on the issue of causation, but this presumption shall be rebuttable by a preponderance of the evidence." Having carefully reviewed the evidence, we cannot say that the trial court erred in accepting the opinions of Dr. Moore over those of Dr. Neely, nor can we say that at this stage of the proceedings the preponderance of the evidence does not support the trial court's determination that Employee failed to establish entitlement to additional treatment for the shoulder injury.

Employee asserts the trial court applied the wrong standard in assessing whether he sustained a shoulder injury, contending the court's statement that Dr. Neely did not consider all causes "applies the wrong standard to an accidental injury involving a specific event of trauma." Tennessee Code Annotated section 50-6-102(14) (2016) defines "injury" and "personal injury" to include an injury by accident "or cumulative trauma conditions, arising primarily out of and in the course and scope of employment." Subsection 50-6-102(14)(A) states that an injury is accidental "only if the injury is caused by a specific incident, or set of incidents, arising primarily out of . . . employment . . . and shall not include the aggravation of a pre-existing disease, condition or ailment unless it

11

can be shown to a reasonable degree of medical certainty that the aggravation arose primarily out of and in the course and scope of the employment." Tenn. Code Ann. § 50-6-102(14)(A). Thus, to be compensable, a specific event of trauma, cumulative trauma, and the aggravation of a pre-existing disease, condition, or ailment must "[arise] primarily out of and in the course and scope of employment." *Id.* Section 50-6-102(14)(B) provides that "[a]n injury 'arises primarily out of . . . employment' only if it has been shown by a preponderance of the evidence that the employment contributed more than fifty percent (50%) in causing the injury, *considering all causes*." Tenn. Code Ann. § 50-6-102(14)(B) (emphasis added). Accordingly, we find no merit in Employee's insistence that the trial court applied the wrong standard when it stated that Dr. Neely did not consider all causes in arriving at his causation opinion.

## Conclusion

For the foregoing reasons, we hold that the evidence does not preponderate against the trial court's denial of the requested medical benefits. Additionally, we hold that the trial court's order does not violate the provisions of Tennessee Code Annotated section 50-6-217(a)(3) (2015). Accordingly, we affirm the trial court's order and remand the case for such additional proceedings as may be necessary.

**FILED**

**December 29, 2016**

**TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD**

**Time: 12:32 P.M.**



**TENNESSEE BUREAU OF WORKERS' COMPENSATION
WORKERS' COMPENSATION APPEALS BOARD**

| | | |
|---|---|---|
| Thomas Petty | ) | Docket No.    2016-06-0841 |
| | ) | |
| v. | ) | State File No.  20550-2015 |
| | ) | |
| Convention Production Rigging, et al. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 29th day of December, 2016.

| Name | Certified Mail | First Class Mail | Via Fax | Fax Number | Via Email | Email Address |
|---|---|---|---|---|---|---|
| D. Andrew Saulters | | | | | X | dsaulters@ortalekelley.com |
| Michael L. Haynie | | | | | X | mhaynie@manierherod.com |
| Joshua Davis Baker, Judge | | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | | X | Penny.Patterson-Shrum@tn.gov |



Matthew Salyer
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: Matthew.Salyer@tn.gov