FILED
01/08/2024
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 1, 2023

## ROGER NOBLE ET AL. v. JERRY GRAY ET AL.

Appeal from the Chancery Court for Rhea County
No. 2020-CV-11278    Melissa Thomas Willis, Chancellor

_____

### No. E2022-01356-COA-R3-CV

_____

Five easement holders filed suit against two other easement holders and the servient estate owners seeking a declaratory judgment regarding whether the easements could be used for commercial logging activities. The trial court concluded that commercial logging activities were not a permissible use of the easements and entered an order restraining and enjoining use of the easements for such activities. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Howard Luxon Upchurch and Stacy H. Farmer, Pikeville, Tennessee, for the appellants, Jerry Gray and Sharon Gray.

Rebecca Lynn Hicks, Dayton, Tennessee, for the appellees, Roger Noble, Sherry Carter, Joan Conner, Gerald Davis, and Bobby Williams.

Howard B. Jackson, Knoxville, Tennessee, for the appellee, Taner Timber Co. Inc.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

At the heart of this case are two private roads in rural Rhea County known as Memory Lane and Lick Hollow Drive. Both roads are narrow, single-lane gravel roads that are approximately eight to twelve feet wide. The land which they traverse, as well as the other real properties discussed in this opinion, originally existed as one large parcel that belonged to Virgil Cox. Eventually, his sons, Jerry Cox and Jeffrey Cox, along with their spouses, acquired an ownership interest in this land. Over the years, the Coxes divided

much of the land into smaller tracts that they sold to various buyers, typically after constructing a home on the tract. Most of the deeds conveying these smaller tracts included easements granting the purchaser ingress and egress for his or her respective tract. The easement holders constructed Memory Lane and Lick Hollow Drive in accordance with the easements in those deeds, and they have maintained the roads by regularly putting down gravel and clearing ditches. Additionally, many of the easement holders had their utility lines buried along and under Memory Lane and Lick Hollow Drive.

*The Easement Holders*

As relevant to this appeal, the easement holders are Roger Noble, Joan Conner, Gerald Davis, Bobby Williams, Sherry Carter, Jerry Gray, and Sharon Gray. The following map[1] depicts Memory Lane and Lick Hollow Drive in relation to the pertinent easement holders' properties:



Beginning at the bottom of the map, Memory Lane connects to Wassom Memorial Highway ("Highway 68"). Two properties abut the entrance to Memory Lane from Highway 68. The small, darkly shaded, square-shaped property to the right of entrance to

---

[1] This map appears in the record as Exhibit 1. The text identifying the roadways and the easement holders' various properties was not included on the exhibit when entered into evidence. We have added the identifying text to assist the reader. During the parties' testimonies at trial, Plaintiffs' counsel had each easement holder indicate his or her property by shading it in on the map with colored pencils or crayons. The identifying text we have added is based on this testimony.

Memory Lane belongs to Mr. Noble and Ms. Conner, and the larger, rectangular-shaped property to the left of the entrance to Memory Lane belongs to Mr. Davis.

Mr. Noble purchased his property from Leon Sneed[2] on June 29, 2009, and the warranty deed conveying this property to Mr. Noble granted him a "non-exclusive right of way easement as recorded in Deed Book 289, Page 8, in the Register's Office of Rhea County, Tennessee." The easement recorded in Deed Book 289, Pages 8-10 ("the 1998 Easement") was a conveyance from Virgil Cox to Jerry Cox on February 2, 1998, giving the grantee a right of ingress and egress for a 5.02-acre tract of land from Highway 68. The 1998 Easement contains language defining it as being for "pedestrian and vehicular ingress and egress from the Grantor's property over and across that part of the driveway presently located on the Grantor's property," and the last page of the 1998 Easement is a survey portraying it as measuring 17 feet in width. Memory Lane originated from the 1998 Easement.

Mr. Davis acquired his property through two separate conveyances. The first conveyance was a warranty deed from Virgil Cox that described the property as "BEING Lot No. One (1) of Virgil Cox Subdivision as shown by plat of record in Plat Book 3, Page 598, Register's Office of Rhea County, Tennessee." The referenced plat shows access to the property from Highway 68 via Memory Lane. The second conveyance was a warranty deed from Jerry and Lavonne Cox for the one-acre tract between Lot 1 and Highway 68. Like the plat referenced in the first deed, a survey recorded with the second deed depicts access to the property from Highway 68 via Memory Lane, but this survey notes that Memory Lane measures thirty feet in width. There is no dispute, however, that the width of Memory Lane has always been less than thirty feet.

Turning again to the map above, Mr. Williams and Ms. Carter own the large, shaded tract in the middle that is outlined in black. They purchased this 8.319-acre tract from Jerry and Lavonne Cox pursuant to a land sale contract. A 2011 survey recorded with the land sale contract provides the legal description of the property and shows access to the property via a path at the end of Memory Lane that is labeled "Old Railroad Bed." A legend that appears on the 2011 survey indicates that Old Railroad Bed is approximately twenty-five feet wide and approaches the Williams property from the northwest. At the northwest corner, the path turns east and runs along the northern boundary of the Williams property. The 2011 survey notes that the section of the path running along the northern border of the property is Lick Hollow Drive and that this section measures fifty feet in width.

The large, darkly-shaded tract adjacent to the Williams property is owned by Mr. and Ms. Gray. The Grays acquired their property through two separate conveyances from Jeffrey Cox and his wife, Vickie Cox: (1) 95.14 acres by a warranty deed and (2) 3.42

---

[2] The record does not contain a thorough chain of title for this property, but the parties do not dispute that the property was once part of the large parcel owned by the Coxes.

acres by a quit claim deed. The warranty deed contained no reference to an easement or right-of-way, but the quit claim deed conveyed to the Grays a "50-foot non-exclusive right-of-way (roadway) from the property of Jeffrey Cox to Highway 68 where said driveway is presently located, and the 50-foot right-of-way (roadway) is located 25 feet on each side of the center line of the present roadway." Although the deed purported to create a fifty-foot easement, all of the foregoing easement holders agree that a fifty-foot easement does not exist on the ground because none of the roadways measure more than twelve feet in width.

*The Dispute*

In late 2019, Mr. Noble, Ms. Conner, Mr. Davis, Mr. Williams, and Ms. Carter (collectively, "the Plaintiffs") learned that the Grays had entered into a timber cutting agreement with Taner Timber, Inc. ("Taner") for Taner to harvest all merchantable timber from fifty-one acres of the Grays' property. Jerry and Lavonne Cox, as the owners of the land which Memory Lane and Lick Hollow Drive traverse, granted Taner permission to use the roads for the commercial logging activities and to widen sections of the roads to accommodate more than one vehicle at a time. Neither the Coxes nor the Grays intended to personally maintain the roads while the logging activities occurred, but the timber cutting agreement included a provision requiring Taner to maintain them at its own costs. Based on the timber cutting agreement, the Grays believed that the roads would be substantially better during the logging activities because Taner would add a new base to the roads, place finished gravel on top of the roads, and grade and level the roads every day before leaving the work site.

As Taner brought in equipment to perform preliminary logging activities in December 2019 and January 2020, however, the condition of the roads deteriorated. Thus, on January 16, 2020, the Plaintiffs filed a complaint against the Grays, Jerry and Lavonne Cox, and Taner seeking a declaratory judgment regarding whether the commercial logging activities were a permissible use of the easements over Memory Lane and Lick Hollow Drive. The complaint included a request for temporary injunctive relief pending a final hearing on the matter, and the trial court granted that request on January 16, 2020, when it entered a temporary restraining order restraining and enjoining the Grays, the Coxes, and Taner "from using the roadways known as Lick Hollow Drive or Memory Lane . . . for any type of logging or related commercial business activity or from excavating within the boundaries of the roadways." The order further restrained and enjoined them from "moving any type of logging equipment" on Memory Lane or Lick Hollow Drive. On February 20, 2020, the court entered an order extending the restraining order but modifying it to allow Taner "to complete repair work on Lick Hollow Drive to make it passable for normal vehicular travel."

The Grays and the Coxes filed an answer on June 29, 2020. Taner did not initially file an answer. After time for performance under the timber cutting agreement expired,

however, Taner filed an answer on April 7, 2021, agreeing to the relief requested in the complaint and asserting a cross-claim for breach of contract against the Grays. Taner requested that the court order the Grays to return $53,209 in funds that Taner had already paid the Grays for the right to log their property and to award Taner $15,597 in damages for the cost of improvements it made to Lick Hollow Drive.

After a one-day trial on the matter, the trial court entered an order on August 30, 2022, concluding that the logging activities at issue "were not a permissible use of the roadways known as Memory Lane and Lick Hollow Drive as it would significantly interfere with the enjoyment and use of [the Plaintiffs'] easement." The court then restrained and enjoined the Grays "from utilizing Memory Lane and Lick Hollow Drive for commercial clear cut logging under the terms of the current easement and current configuration of the roadways." Lastly, the court concluded that Taner was entitled to $68,806 in damages from the Grays. Only the Grays appealed.[3]

The Grays present the following issue for review: whether the trial court erred in enjoining and restraining them from using the easements over Memory Lane and Lick Hollow Drive for commercial logging activities.

STANDARD OF REVIEW

This appeal comes before us after a bench trial. Thus, we review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Hixson v. Am. Towers, LLC*, 593 S.W.3d 699, 709 (Tenn. Ct. App. 2019). We review a trial court's conclusions on issues of law de novo without a presumption of correctness. *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 382 (Tenn. 2015).

ANALYSIS

I. Whether commercial logging activities are a permissible use of the easements.

The Grays contend that the trial court erred in concluding that commercial logging was not a permissible use of the easements over Memory Lane and Lick Hollow Drive. To address this contention, we must consider two things: (1) whether the Coxes, as owners of the land over which Memory Lane and Lick Hollow Drive travel, had the right to grant Taner permission to use the roads for commercial logging activities, and (2) whether the

---

[3] In their appellate brief, the Grays do not identify Taner or the monetary judgment awarded to it among the issues presented for review, and they provide no argument regarding Taner or the judgment awarded to it. Thus, we consider that issue to be waived. *See City of Memphis v. Edwards by & Through Edwards*, --- S.W.3d ---, No. W2022-00087-SC-R11-CV, 2023 WL 4414598, at *2 (Tenn. July 5, 2023) (emphasizing that "an issue must be presented in the manner prescribed by [Tenn. R. App. P. 27] . . . and may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Rule 27(a)(4)").

Grays' right-of-way over the roadways to access their property included a right to use them for commercial logging activities.

## A. The Coxes' grant of permission to Taner

The Grays assert that Memory Lane and Lick Hollow Drive could be used for commercial logging activities because the Coxes granted Taner permission to use the roadways. This argument requires a brief discussion of the basic principles underlying easements. "'An easement is an interest in another's real property that confers on the easement's holder an enforceable right to use that real property for a specific use.'" *Hixson*, 593 S.W.3d at 710 (quoting *Shew v. Bawgus*, 227 S.W.3d 569, 578 (Tenn. Ct. App. 2007) (citations omitted)). "'[A]n easement carries rights and restrictions applicable to the owner of the easement (the dominant estate) and the owner of the property underlying and adjoining the easement (the servient estate).'" *Id.* (quoting *Rogers v. Roach*, No. M2011-00794-COA-R3-CV, 2012 WL 2337616, at *8 (Tenn. Ct. App. June 19, 2012)). Of particular importance here, a servient estate owner's rights include "'generally hav[ing] no duty to maintain or repair an easement for the benefit of the dominant tenant,'" *id.* (quoting 28A C.J.S. *Easements* § 227), and being able to do what is "'necessary to [the servient estate's] use and enjoyment.'" *Cooper v. Polos*, 898 S.W.2d 237, 241-42 (Tenn. Ct. App. 1995) (quoting *Cole v. Dych*, 535 S.W.2d 315, 320 (Tenn. 1976)). But, the servient estate owner is restricted from doing an act that "'unreasonably interfere[s] with the use of the' easement." *Cooper*, 898 S.W.2d at 242 (quoting *Cole*, 535 S.W.2d at 320). In this case, the Plaintiffs and the Grays are the dominant estate owners, and the Coxes are the servient estate owners.

The Grays contend that the Coxes did not unreasonably interfere with the Plaintiffs' use of the easement by granting Taner permission to use Memory Lane and Lick Hollow Drive for commercial logging activities because the roads were suitable for such activities. Evidence in the record, however, shows otherwise. For instance, Bradley Varner testified as an expert in building roads and in conducting logging activities. Having viewed both Memory Lane and Lick Hollow Drive, Mr. Varner described them as follows:

> A. Those roadways intend – look like they were intended to be just single-family residential roads, just – not for commercial activity, but just for – to access residences is all.
> Q. Were they built to any standards?
> A. No, ma'am. Just for what you would say for single-family residences, not for a subdivision or for anything like that.
> Q. What is the surface of those roadways?
> A. Most of them were gravel, which would be crusher run gravel.

He explained that commercial logging roads, on the other hand, are configured differently, particularly in that they use a larger gravel that allows the logging trucks to cause "less

ground pressure in inclement weather so it doesn't press the gravel down in the soil." This larger gravel, however, causes trouble for normal vehicles "by puncturing" tires.

When asked if Memory Lane and Lick Hollow Drive, as they are currently configured, could be used for commercial logging activities, Mr. Varner opined as follows:

> It would be very difficult and pretty much unsafe to be able to use for a commercial logging site just because of the way the roads are set up and the grades, the curvature of the right-of-ways. Lots of different design features were not set up to be able to commercial log, you know, the roads.

Because the roads were not set up to accommodate commercial logging activities, Mr. Varner stated that such activities would have the following effect on the roads:

> A. Typically – and it will all depend on the time of year that it's done in. With the grades that are there and the widths and the curvature of the roads, it would inhibit the people that live along those roads to get in and out. You might need daily maintenance on those roads to make it safe for people to come in and out. It's going to – it's going to tear them up. And there are some utilities there, too, that – we really don't know the depths of the utilities that are there, like the water lines and stuff, but I'm sure it's going to have an effect on those utilities as well.
> Q. And when you say tear them up, can you tell us what will occur?
> A. Oh, it's going to cause some rutting action. Those roads are – like I said, it all depends on the weather, if the logger is coming out in inclement weather or if it's dry weather. If he's going to come out under inclement weather, then it's going to – you know, it's going to rut up. It's going to they – they are going to spin coming out. It's going to be hard to pass because there are some – for instance, going down the hill there toward the – plaintiffs' [the Williams property] house there, that's a pretty good grade, so they are going to have to have – depending on the weather, they are going to have to have help getting up out of there. So it's just going to require daily maintenance.

Mr. Varner described the daily maintenance that would be required as follows:

> A. Okay. So typical truck brings out 30 to 35 ton, net tons of logs, anywhere from 20 to 30. Okay? That – the grade coming up by your plaintiffs, it's a pretty good steep grade. Okay. We'll start at the bottom and come up, so the trucks are typically going to spin and a lot of times they will have to be pushed out by the skidder. And if it's inclement weather, they're going to rut up. Okay? So when they get around to the corners – that coming up the hill, in that neighborhood they're going to have to be pushed around the corners or – or supervised around the corners, so they're going to have to be

graded and – and a lot of times graveled to be able to – to be able for a residential use or for a car. You know, it's not like – a log truck could get back there, but a car might not be able to.

Q. And during the times the maintenance is going on, is that road going to be passable?

A. Not for a car. Yeah. But for another logging vehicle, probably so. But for a car, not.

Mr. Williams's testimony corroborated Mr. Varner's opinion that Memory Lane and Lick Hollow Drive, as configured, were unable to accommodate commercial logging activities. He stated that, when Taner began using Memory Lane and Lick Hollow Drive to conduct its preliminary logging activities, he came home from work and discovered his wife having difficulties accessing their property:

A. In January, after they had come in, they said they were going to cut the corner out [to widen the roads] like I said earlier. Instead of cutting the corner out, they cut half a football field out going all the way down – down the road on – on Lick Hollow, right before my driveway. My wife – I was at work. My wife tried to get out one morning and they had been working on that road in the pouring-down rain for three or four days and the road was so slick and it had big ol' giant – big ol' giant rip rap rock on the driveway. And her little car, she couldn't get up and down the driveway.

Mr. Williams's and Ms. Carter's daughter testified that, after the preliminary commercial logging activities began, she attempted to bring her children to the Williams property for Ms. Carter to babysit them, but she was unable to drive down the hill to reach the property. In fact, she was unable to drive down Lick Hollow Drive to reach her parents' home for approximately a week.

Photographs in the record also support Mr. Varner's opinion that the roadways could not sustain commercial logging activities. Several photographs show that sections of asphalt began breaking up, potholes formed, and large, deep ruts developed in the roadway after Taner began bringing in its equipment to perform preliminary work.

The foregoing evidence shows that permitting Taner to use Memory Lane and Lick Hollow Drive for commercial logging activities did and would continue to unreasonably interfere with the use of the easements. Therefore, we affirm the trial court's determination that the Coxes did not have the right to authorize commercial logging activities over Memory Lane and Lick Hollow Drive.

B. The Grays' use of the roadways

The Grays contend that they have the right to use Memory Lane and Lick Hollow Drive for commercial logging activities because they have an express easement over those roadways for ingress to and egress from their property and that the easement contains no language limiting ingress and egress to mere residential vehicles. For the reasons discussed below, we respectfully disagree.

We have described express easement as follows:

> An express easement is a grant of an interest in land which must comply with the requirements of the statute of frauds at Tenn. Code Ann. § 29-2-101. *Cellco P'ship v. Shelby Cnty.*, 172 S.W.3d 574, 593 (Tenn. Ct. App. 2005); *Mitchell v. Chance*, 149 S.W.3d 40, 47 (Tenn. Ct. App. 2004); *Nunnelly v. Southern Iron Co.*, 29 S.W. 361, 365-66 (Tenn. 1895). "To create an easement by express grant, there must be a writing containing plain and direct language evincing the grantor's intent to create a right in the nature of an easement rather than a license." 25 AM. JUR. 2d *Easements and Licenses* § 15 (2008); *Adcock v. Witcher*, [No. 01-A-01-9505-CH00220,] 1995 WL 675852, at *2 (Tenn. Ct. App. Nov. 15, 1995). "The scope of such an easement is set forth in express terms, either in the granting documents or as matter of incorporation and legal construction of terms of relevant documents . . ." 25 AM. JUR. 2d *Easements and Licenses* § 15. An easement reserved in a recorded plat is sufficient to constitute an express easement. *Moore v. Queener*, 464 S.W.2d 296, 302 (Tenn. Ct. App. 1970); *see also Jacoway v. Palmer*, 753 S.W.2d 675 (Tenn. Ct. App. 1987); *Smith v. Black*, 547 S.W.2d 947 (Tenn. Ct. App. 1976).

*Smith v. Evans*, No. M2007-02855-COA-R3-CV, 2008 WL 3983117, at *2 (Tenn. Ct. App. Aug. 27, 2008).

When construing an instrument creating an easement, a court must "'ascertain and give effect to the intention of the parties.'" *Burchfiel v. Gatlinburg Airport Auth.*, No. E2005-02023-COA-R3-CV, 2006 WL 3421282, at *3 (Tenn. Ct. App. Nov. 28, 2006) (quoting 28A C.J.S. *Easements* § 57 (1996)). The language of a deed determines the parties' intention as to an easement's purpose and scope, and "'the easement holder's use of the easement must be confined to the purpose stated in the grant of the easement.'" *Id.* (quoting *Columbia Gulf Transmission Co. v. Governors Club Prop. Owners Ass'n*, No. M2005-01193-COA-R3-CV, 2006 WL 2449909, at *3 (Tenn. Ct. App. Aug. 21, 2006)). In determining whether an easement holder's use of an easement complies with the stated purpose of the easement, courts consider the following:

"The use of an easement must be confined strictly to the purposes for which it was granted or reserved. A principle which underlines the use of all easements is that the owner of an easement cannot materially increase the burden of it upon the servient estate or impose thereon a new and additional burden."

. . .

"It may be said in general that if an easement is put to any use inconsistent with the purpose for which it was granted, the grantee becomes a trespasser to the extent of the unauthorized use."

. . .

"Where [an] easement is not specifically defined, it need be only such as is reasonably necessary and convenient for [the] purpose for which it was created."

*Id.* (quoting *Adams v. Winnett*, 156 S.W.2d 353, 357-58 (Tenn. Ct. App. 1941)).

Throughout their appellate brief, the Grays claim that the 1998 Easement is the express easement granting them ingress to and egress from their property. A thorough review of the Grays' deeds, however, shows that neither of those deeds contains any reference to the 1998 Easement. In fact, the warranty deed conveying the 95.14-acre tract to the Grays made no reference to any easement or right-of-way. The only express easement granted to the Grays appears in the quitclaim deed conveying the 3.42-acre tract, and it states as follows: "There is also conveyed a 50 foot non-exclusive right-of-way (roadway) from the property of Jeffrey Cox to Highway 68 where said driveway is presently located, and the 50-foot right-of-way (roadway) is located 25 feet on each side of the present roadway." We discern from Ms. Gray's testimony that this easement grants the Grays a right to use the path known as Old Railroad Bed,[4] but the instrument contains no language expressly granting them an easement over Memory Lane or Lick Hollow Drive. Thus, contrary to their assertions, the Grays do not have an express easement granting them access to their property over those roadways.

This conclusion does not mean, however, that the Grays have no right to use Memory Lane and Lick Hollow Drive. "'A common law way of necessity is a type of easement by implication and "rests on the implication that the parties intended and agreed to provide for such a way."'" *Cellco P'ship*, 172 S.W.3d at 591 (quoting *Gowan v. Crawford*, 599 So.2d 619, 621 (Ala. 1992) (quoting *Bull v. Salsman*, 435 So.2d 27, 29 (Ala. 1983)). "'The implication of an easement of necessity is an application of the rule that wherever one conveys property he also conveys whatever is necessary for its beneficial use and enjoyment, and retains whatever is necessary for the use of the land retained.'" *Id.* (quoting 28A C.J.S. *Easements* § 91 (1996)). We have previously acknowledged that a

---

[4] The section of the quitclaim deed granting the easement makes several references to Old Railroad Bed.

- 10 -

property owner's ability to access his or her property is "so essential" to the owner fully enjoying that property "that 'a clear presumption [arises] in favor [of the grantee] as the owner of said remaining tract of land . . . that such easement was of such necessity that an implied reservation thereof must be presumed to have been within the contemplation of the parties at the time of said conveyance.'" *Id.* at 591-92 (quoting *Harris v. Gray*, 188 S.W.2d 933, 935 (Tenn. Ct. App. 1945)).

> Creation of an easement by necessity requires the following:
>
> "1) the titles to the two tracts in question must have been held by one person; 2) the unity of title must have been severed by a conveyance of one of the tracts; 3) the easement must be necessary in order for the owner of the dominant tenement to use his land with the necessity existing both at the time of the severance of title and the time of exercise of the easement."

*Id.* at 592 (quoting *Powell v. Miller*, 785 S.W.2d 37, 39 (Ark. Ct. App. 1990)). Here, the first and second elements are satisfied because the parcels now owned by the Grays originated by deed from a larger tract owned by Virgil Cox.

"The third element, regarding necessity, arises when the conveyance results in the dominant parcel becoming landlocked." *Id.* (citing 28A C.J.S. *Easements* § 93 (1996)). As we have explained:

> Tennessee does not require the existence of strict necessity, and we may find the existence of an easement by necessity where such easements is "of such reasonable necessity to the full enjoyment of the dominant tenement." *LaRue v. Greene County. Bank*, 179 Tenn. 394, 166 S.W.2d 1044, 1050 ( 1942); *see also Harris v. Gray*, 28 Tenn. App. 231, 188 S.W.2d 933, 934-35 (1945). However, "[t]he degree of necessity must be more than mere convenience." *Riffle v. Worthen*, 327 Ark. 470, 939 S.W.2d 294, 298 (1997) (citing *Brandenburg v. Brooks*, 264 Ark. 939, 576 S.W.2d 196 (1979)). "A way of necessity will not be implied where claimant has another reasonable or practicable mode of ingress and egress." 28A C.J.S. *Easements* § 97 (1996).

*Id.*

In this case, neither the warranty deed nor the quitclaim deed provided the Grays with a convenient and adequate right-of-way to access their property from a public street. *See id.* 592-93 (finding an easement by necessity because the express easement in a deed "did not provide a convenient and adequate outlet to a public street"). The need to use Memory Lane and Lick Hollow Drive to access the Grays' property constitutes more than a mere convenience. Therefore, we conclude that the quitclaim deed and warranty deed

- 11 -

created an easement by necessity over Memory Lane and Lick Hollow Drive for the Grays to reach their property.

Having determined the types of easements possessed by the Grays, we now consider the purpose of the easement to determine whether commercial logging activities are permitted. Neither the express easement nor the easement by necessity specifically defines the easement's purpose. The Grays contend that, because the easements do not specifically define, limit, or restrict use of the roadways, they may use them for commercial logging activities.

We find guidance on this issue in the case *Shell v. Williams*, No. M2013-00711-COA-R3-CV, 2014 WL 118376 (Tenn. Ct. App. Jan. 14, 2014). That case involved an express easement that stated, in pertinent part, as follow:

> [T]here is hereby granted an easement or right of way leading from the southeast corner of Tract #7 of the above mentioned survey in a westward direction through the entire tract owned by grantor. This easement is 40 feet in width, and located so that one-half thereof is located across the south lines of lots Nos. 1, 3, 5, 7 and he other one-half across the north lines of lots Nos. 2, 4, 6, and 8. It is understood that this right-of-way is for the use of all said lots, and shall pass with all conveyances of any of the same.

*Shell*, 2014 WL 118376, at *2. Twenty feet of the easement's width was on the property of one of the front lot owners. *Id.* at *1. That front lot owner planted trees and placed boulders on the section of her property located within the easement, but this did not impair use of a gravel driveway that had been constructed inside the easement. *Id.* The back lot owners filed a declaratory judgment action against the front lot owner contending that the trees and boulders "impeded their ability to use the easement for recreational purposes, including riding horses and driving all-terrain vehicles." *Id.* The trial court found that "'it is reasonable that all parties could use the easement for extracurricular activities, including walking, riding horses, and all terrain vehicles,'" and that "by placing the trees and boulders in the easement, [the front lot owner] had interfered with the [back lot owners'] use and enjoyment of the property." *Id.* at *2.

On appeal, the back lot owners, similar to the Grays in this case, argued that, because the easement contained no language limiting the easement to mere ingress and egress, they were not limited in their use of the easement provided it occurred within the 40 feet of width granted in the easement. *Id.* at *7. The *Shell* court rejected this argument and stated as follows:

> We respectfully disagree. As discussed above, the right to use an easement is limited to that which "is reasonably necessary and convenient for [the] purpose for which it was created," even if the easement's purpose is not

- 12 -

specifically defined in the granting document." *Burchfiel*, 2006 WL 3421282, at \*3. Further, this Court explained in *Shew v. Bawgus*, 227 S.W.3d 569 (Tenn. Ct. App. 2007) that the purpose of an easement is determined at an easement's creation. According to the *Shew* Court:

> ["][t]he range of permissible uses of *any* particular easement is in the first instance defined by the circumstances surrounding the creation of that easement; its use is limited to the purposes for which it was created." 28A C.J.S. *Easements* § 159 (1996).

*Id.* at 576 (citing *Cellco P'ship*, 172 S.W.3d at 595) (emphasis added).

*Id.* at \*7-8.

Applying these principles to this case, we note that, at the time the quitclaim deed and warranty deed were conveyed to the Grays, most of the property along Memory Lane and Lick Hollow Drive had already been sold. The deeds for those other properties granted the grantees easements for ingress and egress over Memory Lane and Lick Hollow Drive to access their respective properties. Notably, the 1998 Easement contains language expressly defining it as being for "pedestrian and vehicular ingress and egress." Several of the Plaintiffs testified that, in accordance with that language, the roadways have always been used for light residential traffic, i.e., the various owners coming and going from their respective properties.

The Grays correctly point out that, in the past, the Coxes used the roadways for logging activities. The record shows, however, that those previous logging activities were not commercial logging activities, but rather, they consisted of harvesting a small amount of timber. When asked if there had been any logging activity during the twenty-one years he lived there, Mr. Noble stated, "I saw one six-wheeled truck go out with maybe four or five logs on it one time. That's all I've ever seen." When asked the same question, Mr. Davis responded similarly: "No, not with a big truck. I seen Jeff – that's his [Jerry Cox's] brother – take the logs out in ton truck, you know, like – that's all. I never seen a logging truck."

Based on the foregoing, we believe the evidence in the record supports a finding that the Grays' easements were created to provide them with ingress and egress to their property from Highway 68. Use of the easements for commercial logging is not reasonably necessary and convenient for ingress and egress. We, therefore, affirm the trial court's conclusion that the Grays were not authorized to use the roadways for commercial logging activities.

- 13 -

II.  <u>Whether the Right to Farm Act applies to the parties' easement dispute</u>.

The Grays next contend that the trial court erred in restraining and enjoining them from conducting commercial logging activities over Memory Lane and Lick Hollow Drive because those activities are protected under the Tennessee Right to Farm Act, Tenn. Code Ann. §§ 43-26-101 to -104.  Pursuant to Tenn. Code Ann. § 43-26-103:

> (a) It is a rebuttable presumption that a farm or farm operation is not a public or private nuisance. The presumption created by this subsection (a) may be overcome only if the person claiming a public or private nuisance establishes by a preponderance of the evidence that either:
> (1) The farm operation, based on expert testimony, does not conform to generally accepted agricultural practices; or
> (2) The farm or farm operation alleged to cause the nuisance does not comply with any applicable statute or rule, including without limitation statutes and rules administered by the department of agriculture or the department of environment and conservation.

The Tennessee Supreme Court has stated that the act "protects farms and farm operations from *nuisance claims* by creating a rebuttable presumption that they are not nuisances." *Shore v. Maple Lane Farms, LLC*, 411 S.W.3d 405, 418 (Tenn. 2013) (emphasis added).

In the present case, the Plaintiffs did not assert a nuisance claim.  Rather, their claim pertains to interpreting an easement and the rights of the parties thereto.  We, therefore, agree with the trial court's determination that the Tennessee Right to Farm Act does not apply to this case.

CONCLUSION

The judgment of the trial court is affirmed.  Costs of this appeal are assessed against the appellants, Jerry Gray and Sharon Gray, for which execution may issue if necessary.

_/s/ Andy D. Bennett_____
ANDY D. BENNETT, JUDGE

- 14 -